**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Humberto E. DURAN–OROZCO,**
**Defendant–Appellant.**

**United States of America,**
**Plaintiff–Appellee,**

v.

**Rosalva Perez–Ortiz, Defendant–**
**Appellant.**

**Nos. 98–10359, 98–10360.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Aug. 13, 1999.

Decided Sept. 21, 1999.

As Amended Nov. 2, 1999.

Walter B. Nash, III, Tucson, Arizona, for defendant-appellant Humberto Duran–Orozco.

William Rothstein, Nogales, Arizona, for defendant-appellant Rosalva Perez–Ortiz.

Christina M. Cabanillas and John P. Leader, Assistant United States Attorneys, Tucson, Arizona, for the plaintiff-appellee.

Before: NOONAN, THOMPSON, and GRABER, Circuit Judges.

NOONAN, Circuit Judge:

Humberto E. Duran–Orozco (Duran) and Rosalva Perez–Ortiz (Perez) appeal their convictions of conspiracy to possess marijuana with intent to distribute in violation of 21 U.S.C. § 846 and of possessing marijuana with intent to distribute in violation of 21 U.S.C. § 841(a)(1). Both challenge the search warrant used to procure evidence against them, the admission at trial of prior acts involving marijuana, and pretrial identification of them. Duran also challenges the district court's refusal to admit portions of his post-arrest statement. Perez also challenges her sentence. We affirm most of the rulings of the district court, but remand for its determination of whether the agents would have sought a warrant if they had not obtained information by an unjustified warrantless search.

## FACTS

At about 9:00 p.m., January 14, 1997, the National Guardsman operating a night vision scope for the Border Patrol surveilling the international border at Nogales, Arizona, saw eight persons carrying backpacks walking north from the border from Mexico between the United States. Approximately half an hour later the scope operator saw four of these persons walking south toward Mexico. Border Patrol Agent Anthony Betts was notified. He directed Agent Steven Bartholomew and Supervisor Rene Mares to the area of Royal Road where the backpackers had been observed. Agent Bartholomew went to a known narcotics trail from Mexico. He found fresh footprints and followed them to a house at 1047 Royal Road. To the west of this home there was only desert and, one to two miles further, the Mexican border; to the east there was a single house. Standing at the property line of 1047 Royal Road, Agent Bartholomew observed a man and a woman come out of the house and get into a maroon Ford Taurus. Bartholomew radioed Betts to check out the car.

Bartholomew himself continued to track the footprints. They led to the front porch. Bartholomew approached the porch. He saw that it was freshly swept and that outside the front door was a

broom. He also observed one muddy footprint going under the front door. At this point Supervisor Mares joined him. Looking through the front window they saw more muddy footprints on the carpet going across the living room and leading to a closed door. At about 9:45 p.m., Agent Betts joined the other two. They noticed fabric signs from burlap in the mud outside the house and inferred that the burlap imprints came from recently-delivered drugs. The agents went to the back of the house, opened a gate in a fence around the backyard and looked into the room to which the footprints led. Using a flashlight, they saw burlap bags and bundles of marijuana wrapped in cellophane and duct tape.

Before joining Bartholomew and Mares, Betts had stopped the Taurus and, with the driver's consent, had searched the trunk, finding nothing. The area of the stop was well-lighted. Betts had an opportunity to observe both people who were in the car. He later identified them as Duran and Perez.

At 12:33 a.m., January 15, George Diaz, an agent of the Drug Enforcement Agency, telephoned Raymond T. Terlizzi, a magistrate judge, to apply for a search warrant. Diaz had previously been authorized to do so by Assistant United States Attorney Jerry Albert. Diaz had written out the grounds for the warrant and, after having been sworn, read them to the judge. The substance was as follows:

> On January 14, 1997, at about 9 p.m., U.S. Border Patrol Lowell (?) Post Operator observed 8 individuals carrying bundles walking North from the U.S. Mexico border. Border Patrol agents then located several footprints that led to a residence at 1047 North Royal Road. At this residence were also observed signs that burlap bags had been dropped on the ground and that a broom had been used to erase footprints. Inside the residence, through a window, were observed several burlap bags and a

number of cellophane plastic wrapped packages containing marijuana.

On entering 1047 Royal Road pursuant to the warrant, the agents found a nineteen-year old Mexican national, Jose Ramon Estrada. They arrested him. He later testified for the government. He stated that he had met Duran on January 12 and been recruited by him to watch 1047 Royal Road the evening of January 14. A little before seven on the evening of the 14th Duran picked him up near the port of entry from Mexico and drove him to the house. He sat down in the living room with Duran and Perez. A person came to the door asking for the former. Duran admitted him, and six or seven other persons entered carrying bundles, which they deposited in the living room. Duran and Estrada moved the bundles to the back of the house, while Perez watched them.

Duran and Perez were arrested on January 17, 1997. Duran made a statement that he and the sister of Perez were the only persons at 1047 Royal Road the night of January 14; that he did not go to the port of entry on that day; and that he lived at 1047 Royal Road. Just before their arrest Duran and Perez were identified at the DEA office by Agent Betts as the two occupants of the car he had stopped on January 14. Betts identified them again on April 17, 1997, from photos in two photographic lineups.

## PROCEEDINGS

On February 12, 1997, Duran and Perez were indicted for the crimes of which they were ultimately convicted. They moved to suppress the identification made by Betts as a result of his stopping the Ford Taurus and to suppress the evidence obtained as the result of the search warrant. After an evidentiary hearing, the district court found that Agent Betts had had founded suspicion to stop the car and that the entry into the backyard was warranted by exigent circumstances. The court denied the motion to suppress. The court also ruled

in limine that evidence was admissible that in May and June of 1996 marijuana had been found on the premises of 1047 Royal Road.

After a four-day trial a jury convicted Duran and Perez on both counts. At the sentencing hearing Perez introduced evidence showing that she was the mother of five children, ranging in age from 3 to 17. The district court declined to depart downward on this account. The court gave each defendant a two-level reduction for acceptance of responsibility, U.S.S.G. § 3E1.1 and safety value, U.S.S.G. §§ 2D1.1.(b)(6) and 5C1.2. The resulting sentences were 3 years and 5 months imprisonment for Duran and 2 years and 3 months for Perez, to be followed by supervised release in each case.

The defendants appeal.

*The Evidence Supporting The Search Warrant.* The defendants contend that the circumstances under which the three agents entered the backyard and looked through the back window were not exigent and therefore constituted a warrantless intrusion into the house in violation of the Fourth Amendment. They point out that, once having taken a look, the agents retreated to the perimeter and waited over two and one-half hours for the warrant. What was so demanding about the situation that the agents could not have waited without looking in the back window?

█ We are not eager to second guess police engaged in dangerous work, especially such work at night near the border, with good reason to believe that at least four persons involved in the operation they were investigating might be at large and near at hand. However, the agents themselves at the evidentiary hearing conceded that they could have guarded the perimeter without first looking in the back window. The concession undermines their claim of exigency. We accordingly strike the final sentence of the application for the search warrant because that sentence was the result of the warrantless unjustified search. *See United States v. Vasey,* 834 F.2d 782, 788 (9th Cir.1987). We look at the remainder of the application. The defendants do not challenge the agents' entry on the front of the premises and the look that saw the broom, the erased footprints, and the imprints from burlap bags. This entry and this look were taken in tracing the footprints to 1047 Royal Road. This information, as well as the information that steps had been taken to conceal the trail, was sufficient, when added to the information about the eight persons carrying bundles north from the border, to furnish probable cause for issuance of the search warrant. The defendants contend that the Border Patrol lacked statutory authority to search for drugs, citing *United States v. Santa Maria,* 15 F.3d 879, 881 (9th Cir.1994). But nothing prevented the Border Patrol from furnishing relevant information to the DEA for use in the application for the search warrant. Unlike the agents in *Santa Maria,* the DEA agents proceeded on the basis of a warrant.

█ The government, however, does have a further hurdle to surmount. The agents might not have applied for a search warrant if they had not made their warrantless search at the back of the house and incorporated its fruits in the application for a warrant. We are not in a position to determine what they would have done. That is the job of the district court, which, after an evidentiary hearing, must make an explicit finding on this question. *See Murray v. United States,* 487 U.S. 533, 542–43, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988). We remand for such a hearing to be held. *See United States v. Hill,* 55 F.3d 479, 481 (9th Cir.1995). If the district court determines that the agents would not have sought the warrant, the evidence obtained under its authority must be suppressed and the defendants given a new trial. If the district court determines that the agents would have sought the warrant without the tainted look, the following will apply.

■ *The Identification Of Duran And Perez.* The defendants argue that their pretrial identification by Agent Betts was, on two occasions, so suggestive that his testimony identifying them should not have been admitted at trial. The identification by Betts of Duran and Perez when they appeared as suspects at the DEA office occurred three days after he had stopped their car. It was an appropriate step in being sure that the DEA had the people they were looking for; it did not impermissibly affect his memory or taint his testimony. The second identification was made from photo lineups, one showing six pictures of women, the other six pictures of men. In the lineup of women, only Perez was holding a large piece of white paper in front of her. In the lineup of men, only Duran was similarly holding a large piece of paper before him. The district court held that the photos were not unduly suggestive. The government has offered copies of the photos in its supplemental excerpt of record. It is not at all clear to this court why the two defendants, and only the two defendants, should have been marked and photographed holding pieces of paper in front of them. The suspicion that the pieces of paper were meant to distinguish them is almost unavoidable. On the other hand, in each array one person (not a defendant) was photographed against height markers of the kind typically associated with criminal defendants, an arrangement that also carried a suggestion of guilt as to those so photographed. In short, the photo arrays carried mixed suggestions.

■ But even if a pretrial procedure is impermissibly suggestive, "automatic exclusion" of identification testimony is not required. *United States v. Montgomery,* 150 F.3d 983, 993 (9th Cir.), *cert. denied,* —— U.S. ——, 119 S.Ct. 267, 142 L.Ed.2d 220 (1998). Betts had the opportunity to view Duran and Perez minutes after their participation in the drug delivery; he gave them the attention an alert police officer would give to possible suspects; he was fairly, although not totally, accurate in his description of them; and he was positive in his identification. His testimony was therefore reliable and admissible. *See Neil v. Biggers,* 409 U.S. 188, 199–200, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972).

■ *The Exclusion Of Part Of Duran's Post Arrest Statement.* While admitting the portions of Duran's post-arrest statement that the government showed were false along with Duran's admission of living at 1047 Royal Road and being there on January 14, the court, over objection, excluded cross-examination of the agent bringing out that Duran explained why he was at home on the evening of January 14 and how he had not seen any drugs. The court's ruling was well within its discretion. Duran's post-arrest statement was not a confession, where completeness would have been required. *See United States v. Dorrell,* 758 F.2d 427, 434–35 (9th Cir.1985). Duran's statements as to residency and presence at Royal Road were admissions of facts woven into the chain of evidence against him; however, the excluded portion of his statement would not have cast further any extenuating light on his declaration, but, rather, confirmed that he made himself at home at 1047.

*The Prior Bad Acts.* On the evening of May 31, 1996, operators of a thermal imaging scope observed people entering the United States from Mexico and walking toward Royal Road. Agents went to the area and followed fresh footprints to 1047. At 1047 they found footprints and a Dodge pickup parked in the driveway in front. In the Dodge they found bundles of marijuana packed in cellophane. The agents knocked at the door of the house, but no one answered. They then towed off the truck and weighed the marijuana. It amounted to 571 pounds.

Less than a week later, on June 5, 1996, thermal imagery again detected suspicious activity in the area, and the agents again traced footsteps leading to 1047. The footsteps went across the front yard and had

then been brushed out. Leaning against the west wall of the house were two bundles of marijuana. There were no lights on in the house, and the agents did not knock. They carted off the marijuana, which weighed 34 pounds.

The evidence as to these two incidents was admitted at trial with a cautionary instruction by the court that the defendants were not on trial for these acts. The defendants objected to the admission and press their objection on this appeal, stressing the point that there was no evidence that either of them was shown to have participated in the two earlier drug deliveries.

The government responds that Perez owned the house and that Duran had been involved with her since January 1995. Duran replies that there is no evidence that he was living with her at 1047 in May and June of 1996. The government replies that the threshold is "low" for admissibility of prior bad acts establishing a pattern, *see United States v. Houser*, 929 F.2d 1369, 1373 (9th Cir.1990), and that the jury may consider the evidence of the charged crimes in assessing whether the defendants had committed the other acts, *see Huddleston v. United States*, 485 U.S. 681, 689, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988).

■ The pattern of deliveries here had some, though not complete, similarity. Duran's connection with the 1996 deliveries was, to a degree, speculative, because his residence in 1996 was not proved; to judge from the January 14, 1997 affair, he was the leader. Perez's connection may be stronger: She was the owner of the house. Quantities of marijuana do not appear at one's residence by magic. In this close case, where the district court exercised discretion, we need not pass on the correctness of his ruling but treat the admission of these incidents as error harmless in the light of Estrada's testimony as to Duran's key role, the identification of Duran and Perez leaving 1047 after the January 14, 1997 delivery, and the recovery of bags of marijuana in the house

where Duran and Perez had so recently been.

■ *Downward Departure.* The district court, acknowledged that it had discretion to depart downward on account of Perez's maternal responsibilities, but declined to do so. We are without jurisdiction to review this decision. *See United States v. Morales*, 898 F.2d 99, 101 (9th Cir.1990).

The case is REMANDED to the district court for proceedings in accordance with this opinion.