**UNITED STATES of America,
Plaintiff,**

v.

**Derrick Jermaine JAY and Dionne
Leaquone Baker, Defendants.**

**No. CR 01–326–BR.**

United States District Court,
D. Oregon.

Jan. 7, 2003.

961

Michael W. Mosman, United States Attorney, Scott Kerin, Assistant United States Attorney, Portland, OR, for Plaintiff.

Steven T. Wax, Federal Public Defender, Nancy Bergeson, Assistant Federal Public Defender, Portland, OR, for Defendant Derrick Jermaine Jay.

Gary B. Bertoni, Bertoni & Todd, Portland, OR, for Defendant Deon Leaquone Baker.

## OPINION AND ORDER

BROWN, District Judge.

On August 15, 2001, the government brought a five-count Indictment against Defendants Derrick Jermaine Jay and Deon Leaquone Baker as follows: In Count 1, the government charges Baker as a felon in possession of two firearms on June 22, 2001, in violation of 18 U.S.C. § 922(g)(1); in Count 2, the government charges Jay as a felon in possession of four firearms on June 22, 2001, in violation of 18 U.S.C. § 922(g)(1); in Count 3, the government charges both Jay and Baker with possession of cocaine with intent to distribute on June 22, 2001, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(c) and 18 U.S.C. § 2; in Count 4, the government charges Jay and Baker with knowingly carrying certain firearms during and in relation to a drug trafficking crime on June 22, 2001, in violation of 18 U.S.C. § 924(c); and in Count 5, the government charges Jay and Baker with knowingly possessing certain firearms in furtherance of a drug trafficking crime on June 22, 2001, in violation of 18 U.S.C. § 924(c).

This matter comes before the Court on the Motions to Suppress Evidence of Defendant Derrick Jermaine Jay (# 54) and Defendant Deon Leaquone Baker (# 57). The Court conducted an evidentiary hearing on both Motions on September 26 and 27, 2002. The parties subsequently submitted supplemental memoranda.

For the reasons that follow, the Court **GRANTS in part** and **DENIES in part**

Jay's Motion (# 54) and **GRANTS** Baker's Motion (# 57) as herein specified.

### FACTS

Portland Police Officers Steven Staul, James Michael Stradley, and Joseph Santos are the only witnesses who testified at the evidentiary hearing. The Court finds these witnesses were credible and accepts their testimony as true.

In summary, the Court finds the following facts by a preponderance of the evidence:

On June 16, 2001, Vanessa Vaughn and Joseph Hayes reported to Portland police that the driver of a blue Chevrolet Celebrity made offensive and threatening statements to them about their interracial relationship and then pointed a semi-automatic handgun at them. Vaughn and Hayes described the driver as a black male, 25 to 30 years old, 5′9″, 160 pounds, black hair, brown eyes, and wearing a black nylon "cap." Patricia Clarke witnessed the incident and gave police a partial license plate number for the suspect vehicle. The next day Vaughn notified police when she saw the same blue Chevrolet Celebrity in the vicinity of N.E. 8th Avenue and N.E. Holman Street. Officers drove Vaughn to the vehicle, which was parked in the driveway of a duplex unit at 6233 N.E. 8th Avenue. The license plate on the vehicle was consistent with Clarke's description. In addition, Vaughn positively identified the vehicle as the one the suspect drove the day before.

According to police records, Baker had been stopped in the same blue Chevrolet Celebrity several weeks earlier. Police records also showed Baker's race, height, weight, and gender were similar to the man described by the victims, and he had previously been convicted of a felony. Thus, if Baker, a convicted felon, was the one who menaced Vaughn and Hayes with a firearm, the officers also would have cause to believe Baker was a felon in unlawful possession of a firearm on June 16.

Accordingly, officers asked Vaughn, Hayes, and Clarke to view a six-photo montage that included Baker's photo. None of the photos, however, showed men wearing a "cap," and no one identified anyone in the montage as the man who threatened and menaced Vaughn and Hayes.

In the morning of June 22, 2001, Officers Stradley and Santos saw the blue Chevrolet Celebrity in front of the same duplex and decided to investigate further. Officer Stradley took a surveillance position inside an unmarked police van parked near the intersection of N.E. 8th Avenue and N.E. Holman Street and began to watch the duplex. Officer Santos was in an unmarked police car nearby. Officer Stradley saw two black men, one wearing a black "do-rag," leave the duplex and depart in a gray Chevrolet Caprice at 11:50 a.m. Based on his memory of Baker's photo, Officer Stradley thought the one wearing the do-rag was Baker. Police later identified the other man as Jay.

Officer Stradley believed the tinted windows of the gray Caprice were too dark in violation of Oregon law, and he radioed his observations to Officer Santos. Officer Santos followed the gray Caprice for a distance. He also thought the windows were tinted too dark. At 12:09 p.m., Officer Santos asked Officer Staul, who was in uniform and driving a marked police car, to stop the gray Caprice on the pretext of investigating the tinted windows. When Officer Staul did so, he also concluded the windows were tinted too dark. Two months earlier, however, Jay paid "Quick Tint" $160.00 to tint all windows on the Caprice "35%." [1]

---

**1.** Pursuant to Or.Rev.Stat. § 815.221(2)(c), a

person may operate a motor vehicle with tint-

During the 10–minute traffic stop, Officer Staul identified Baker and Jay as the occupants of the gray Caprice, determined there were no warrants outstanding for either of them, and conversed with Baker about the overalls he was wearing. Officer Staul issued no citations and allowed Baker and Jay to leave in the gray Caprice.

Meanwhile, Officer Stradley continued his surveillance of the duplex. At 12:40 p.m., he saw a black woman emerge from the duplex and load something that looked like laundry into the blue Chevrolet Celebrity. When the woman drove the Chevrolet Celebrity away at about 1:00 p.m., Officer Santos followed. Officer Santos saw the vehicle proceed through the intersection of N.E. Ainsworth and N.E. Martin Luther King, Jr., Boulevard against a red light. Officer Santos asked Officer Staul to stop the vehicle on the pretext of investigating the traffic violation. Officer Staul identified the driver as Shawnta Foster, ended the traffic stop within five minutes, and told Foster she was free to go.

Before Foster left, however, Officer Santos approached her, identified himself as a police officer, told her he was investigating a gun crime involving the blue Chevrolet Celebrity she was driving, and asked her if she knew Baker. Foster said she had driven the Celebrity for only two days. Foster denied knowing Baker and denied any men had been to her residence recently. After Foster gave Officer Santos consent to search the blue Chevrolet Celebrity, he found a traffic citation in the glove box dated June 6, 2001, that identified Baker as the driver of the blue Chevrolet Celebrity on that date. Officer Santos also found two other papers with Baker's name on them. Officer Santos confronted Foster with his belief that she was lying about Baker and that Baker may have

been involved in the gun incident on June 16. Officer Santos asked Foster for consent to search the duplex at 6233 N.E. 8th Avenue for a firearm Baker may have used on June 16 and for evidence that Baker lived there. When Foster refused to consent to a search of her residence, Officer Santos told her that he might try to obtain a search warrant. Officer Santos allowed Foster to leave at about 1:30 p.m.

Back at the duplex, Officer Stradley saw the gray Chevrolet Caprice pull into the driveway at about 1:45 p.m. As Baker and Jay got out, a white Ford Bronco vehicle arrived. Baker got into the Bronco, and it proceeded westbound on N.E. Holman Street away from the surveillance van. On foot, Jay also proceeded westbound on N.E. Holman Street. Shortly after Officer Stradley lost sight of Jay and the Bronco, he saw Baker and Jay both walking quickly eastbound back toward the surveillance van. Baker was talking on a cell phone, and both Baker and Jay appeared to be looking intently for something. They peered into every vehicle and driveway along the way. When they reached the surveillance van, they each looked into the darkened windows, cupping their hands in an effort to see inside. Officer Stradley slid down and "made himself small" to avoid detection. Jay said "[M]an, there's no police in this van."

As they walked away from the surveillance van, Baker and Jay each looked concerned and nervous. Baker and Jay returned to the duplex. Baker walked out of sight toward the front door of the duplex. Jay continued to look around nervously and then got behind the wheel of the gray Chevrolet Caprice, backed it out of the driveway, stopped it facing southbound on N.E. 8th Avenue with the passenger door

---

ed windows if the total light transmittance through the tinted windows is 35 percent or more.

next to the driveway, leaned across the front passenger seat area, and opened the passenger door as if he was waiting for Baker. Shortly thereafter, Officer Stradley saw Baker moving fast but carefully down the driveway. Baker's knees were bent, and he was cradling in both arms a bundle wrapped in yellow clothing. Baker looked around nervously and quickly got into the waiting gray Chevrolet Caprice.

Officer Stradley suspected Foster telephoned Baker, told him the police were asking questions about him and the June 16 incident, and advised him the police might be coming to search the duplex. Officer Stradley also thought Baker and Jay were moving something illegal from the duplex because Baker and Jay had been looking around intently as if for police and were in a hurry to get Baker and his bundle away from the duplex. Based on his training and experience, Officer Stradley thought Baker was carrying drugs, guns, or both. Officer Stradley continued his radio broadcast describing the actions of Baker and Jay. Ultimately, he radioed to other officers in the area, "[I]t's going down. This is it."

As soon as Baker was inside the gray Chevrolet Caprice with his bundle, Jay "punched the accelerator," and the car took off fast southbound. Almost immediately, however, the car stopped suddenly and moved just as quickly in reverse up to the uncontrolled intersection at N.E. 8th Avenue and N.E. Holman Street, angling rearward toward the west and pointing eastbound, again facing the surveillance van. An unidentified black male on a bicycle rode to the passenger side of the car, stopped briefly, and said a few words. The car then sped away northbound from N.E. Holman Street on N.E. 9th Avenue.

In his radio broadcast, Officer Stradley described the various traffic violations he witnessed as the gray Chevrolet Caprice sped away. Officer Santos decided to arrest both Baker and Jay because he thought there was probable cause to believe Baker was the suspect in the June 16 incident and, therefore, also was guilty of being a felon in possession of a firearm on that day. In addition, Officer Santos concluded it was probable that Baker and Jay were moving the firearm involved in the June 16 incident and, as a result, he could arrest Baker and Jay as felons then in possession of a firearm. Finally, Officer Santos thought it was likely that both Baker and Jay were trying to dispose of something else that was illegal, and, therefore, he believed he had probable cause to arrest them both for tampering with evidence or hindering prosecution in violation of Oregon law.

Within ten minutes, Officer Santos saw the gray Chevrolet Caprice already stopped in front of a residence on N.E. Portland Boulevard Court. Before Officer Santos stopped his car in front of and facing the Caprice, Jay was already out of the Caprice. Jay walked toward Officer Santos carrying a white plastic grocery bag. In plain clothes but visibly displaying his badge, Officer Santos identified himself as a police officer and told Jay he wanted to talk with him. Jay continued toward Officer Santos and responded, "[W]e don't have to do anything" and "I don't have to talk to you." Meanwhile, Officer Santos also saw Baker leaning forward in the front passenger seat of the Caprice focused on something apparently at his feet. Addressing Baker, Officer Santos again identified himself as a police officer and said he wanted to talk with Baker, too. While Jay continued to approach Officer Santos with the bag in his hand and Baker seemed preoccupied with something at his feet, Officer Santos became concerned for his safety and feared Baker was thinking about shooting him or running. Officer Santos pointed his firearm at Jay and Baker, gave them com-

mands, and ordered both of them to show their hands and to stop. Baker got out of the Caprice with the bundle in his arms, but he put it back into the car as another police officer approached. Eventually, five police vehicles arrived to cover Officer Santos, and several officers pointed their weapons at Baker and Jay. Jay dropped the plastic bag he was carrying. Officer Santos could see the bag contained some baby food and three boxes of baking soda, which Officer Santos knew was used to convert powder cocaine to rock cocaine.

At about 2:30 p.m., police took Baker and Jay into custody and separated them. The officers put away their weapons. Baker invoked his rights and made no statements to police.[2]

Officer Santos looked inside the gray Celebrity and saw a rolled-up yellow shirt on top of something on the floor of the passenger side. Officer Stradley identified this item as the thing he saw Baker carrying from the duplex.

While Jay was sitting handcuffed in the back of Officer Staul's police car, Officer Santos advised him of his *Miranda* rights. Jay asked to speak with Officer Stradley, who repeated the *Miranda* warnings. Jay was very calm, cooperative, and indicated he understood his rights. In response to questions from Officer Stradley, Jay confirmed Foster had telephoned Baker and told him police were looking for Baker and wanted to search her residence. According to Jay, Baker admitted he and a former girlfriend had a dispute days earlier.[3] Jay acknowledged he and Baker returned to the area of the duplex to look for police

after Foster's call. Jay also told Officer Stradley that he thought Baker was hiding "dope," a gun, or both in the bundle Baker carried from the duplex. Jay, however, denied all responsibility for whatever Baker was carrying.

Officer Stradley asked Jay for permission to search the gray Caprice. After initially hesitating, Jay gave his consent. Jay also gave police the car keys and his permission to have the vehicle towed to police storage. Jay, however, continued to disclaim any connection to anything illegal in the car. Jay insisted the only contraband police might find "would be whatever Mr. Baker had brought into the car."

The officers did not search the gray Caprice based on Jay's consent. Instead Officer Santos telephoned Multnomah County Deputy District Attorney Scott Kerin[4] and discussed, among other issues, whether to seek a search warrant for the gray Caprice notwithstanding Jay's consent. The officers were concerned Jay could not authorize a search of the shirt-wrapped bundle because he disclaimed any interest in it. The officers and Assistant District Attorney Kerin determined it would be prudent to seek a warrant.

After about 30 minutes, officers transported both Baker and Jay to the Portland Police Bureau Northeast Precinct and kept them in custody there for at least 12 hours. Baker did not want to speak with police. The officers, therefore, focused on Jay. Initially Officer Stradley interviewed Jay for about 90 minutes in an interview room. Jay remained calm and cooperative throughout the afternoon and evening

---

**2.** In Baker's Motion to Suppress, he seeks to suppress, *inter alia*, all statements he made to police "on June 22, 2001, and June 26, 2001." The Court is unaware, however, of any substantive statements Baker may have made on either date.

**3.** If Vaughn was Baker's former girlfriend, however, her inability to identify Baker's pho-

tograph is difficult to understand, especially if Baker was, as police suspected, the man who menaced Vaughn and Hayes on June 16, 2001.

**4.** Since then, Scott Kerin has been appointed Assistant United States Attorney and represents the government in this matter.

while police questioned him. The officers treated Jay respectfully, did not threaten him, and conducted the questioning professionally. The officers made sure Jay had a soda and water. They gave him a blanket and checked on him every 15 minutes while he was in the holding cell.

As time went on, however, Officer Stradley developed concerns about Jay's identity and thought Jay was lying when he denied any involvement in criminal activity with Baker. At about 6:00 p.m., Officer Stradley telephoned Al Smith, the state probation officer who supervised Jay. The probation officer confirmed Jay's identity. In addition, Officer Stradley asked Smith whether he would place a state probation detainer on Jay to hold him in custody. After conferring with his supervisors, however, Smith declined to place a detainer on Jay.

In summary, at Northeast Precinct Jay told Officers Stradley and Santos the following: (1) Baker lived with Foster at the duplex; (2) Baker told Jay to carry the sack that contained baking soda; (3) Jay knew baking soda is used to convert powder cocaine to rock cocaine; (4) Foster phoned Baker and warned him the police might search the duplex; (5) Baker told Jay to return to the duplex; (6) Baker and Jay looked for police in the area of the duplex and looked into the surveillance van where they suspected police were hiding; (7) Baker took "something illegal" from the duplex, hid it in his shirt, brought it to the Caprice, and told Jay to drive away fast; (8) Baker owned the blue Chevrolet Celebrity; and (9) Baker told Jay he had been in an altercation with a female several days earlier.

At about 11:30 p.m., Officer Stradley telephoned Jay's mother to inform her that Jay was in custody and would not be coming home that night. Jay's mother tried to invoke Jay's *Miranda* rights, and she insisted Officer Stradley not speak further

with Jay. Officer Stradley agreed to let Jay know his mother thought he should not speak further with the police. Later, attorney Randy Richardson telephoned Officer Stradley, indicated Jay's mother had retained him to represent Jay, and asserted he was invoking Jay's *Miranda* rights. Officer Stradley questioned Richardson about whether counsel retained by Jay's mother could invoke Jay's rights. Richardson followed up the telephone conversation with a FAX transmission in which he confirmed his representation of Jay and asserted Jay's *Miranda* rights on Jay's behalf.

When Officer Stradley next spoke with Jay, he told Jay about his mother's concerns and that his mother had retained Richardson, who was seeking to invoke his *Miranda* rights. Officer Stradley also informed Jay that he would not ask him any more questions unless Jay chose to speak further with him even though Jay knew his mother and an attorney did not want him to talk to the police. At that point, Jay invoked his rights, and the police did not ask Jay any more questions.

Officer Santos completed his Affidavit in support of an application for two search warrants. The Affidavit accurately recited the officers' investigation, observations, and suspicions. The Affidavit also included a detailed summary of Jay's statements while in custody. Officer Santos presented the Affidavit to a state court judge, the Honorable Michael Marcus, in the early hours of June 23, 2001. At 1:30 a.m., Judge Marcus signed two search warrants: one for the gray Chevrolet Caprice and one for Foster's duplex at 6233 N.E. 8th Avenue.

When Officer Santos and Officer Stradley searched the Caprice pursuant to the Search Warrant at about 4:00 a.m., they found under the yellow shirt on the floor a bag that contained a brick of powder cocaine and a box that, in turn, contained a

coffee carafe and a turkey baster (items that could be used to make powder cocaine). Under the seat where Baker had been sitting, Officer Stradley also found two loaded firearms: a revolver (later determined to be stolen) and a semi-automatic handgun.[5] In addition, the officers found (1) overalls like the ones Baker had been wearing earlier in the day; (2) a face mask and gloves inside the overalls; (3) paperwork in the glove box bearing Jay's name; (4) photographs of Jay, including one depicting him with a revolver in his waistband; (5) a disposable camera; and (6) miscellaneous other items.

Thereafter officers transported Jay and Baker to jail sometime after 6:00 a.m. on June 23, 2001. At 11:19 a.m., Jay telephoned his girlfriend, Khalida Thompson, from jail where telephone conversations made to or by jail inmates are recorded routinely with repeated notice to those involved. In the 11:19 a.m. recorded conversation with Thompson, Jay explained the circumstances of his arrest. Thompson asked Jay if police found "anything" in Jay's car that belonged to Jay. Jay told Thompson the only items in his car belonged to Baker. Thompson continued to question Jay about whether Jay had the "you know what" in the car. Jay told her "it" was under Thompson's bed, and he asked her to look under her bed "right now" and to take it "outside." In a second call to Thompson at 11:35 a.m., Jay confirmed with Thompson that "it" was no longer in her house.

When officers listened to that recording on June 25, 2001, they thought Jay, a felon, was referring to a firearm because people commonly keep firearms underneath a bed or between mattresses for ready access. In addition, Officer Santos knew from experience that prohibited persons like Jay often refer to guns in code.

On June 25, 2001, officers searched the duplex at 6233 N.E. 8th Avenue pursuant to the Search Warrant Judge Marcus issued on June 23. The officers found a small quantity of crack cocaine, a razor blade, and a box of plastic bags.

On June 25, 2001, Officer Stradley also showed to Vaughn and Hayes a six-photo montage that included Jay's image. Although Hayes was not able to identify anyone, Vaughn picked Jay's photo and was positive he was the man who pointed a gun at her and Hayes on June 16, 2001.

On June 28, 2001, Officer Santos prepared an Addendum to his Affidavit in Support of a Search Warrant for Khalida Thompson's apartment at 2310 N. Killingsworth Street. Judge Marcus issued that Search Warrant at 4:45 p.m. on the same day. When officers executed the Search Warrant, they found a revolver and a semi-automatic handgun wrapped in a towel next to the back door.[6] Thompson told police the guns belonged to Jay and Jay had obtained one of them from Baker.

### DISCUSSION

Jay contends the officers lacked probable cause to justify the pretext traffic stop of the gray Chevrolet Caprice and, accordingly, he seeks to suppress evidence of his identity. In addition, both Jay and Baker jointly assert there was no probable cause to support their warrantless arrests on June 22, 2001, and they urge the Court to suppress the evidence seized pursuant to the three Search Warrants because they are "fruits of the poisonous tree" and the "good faith" exception to the exclusionary rule should not apply. Finally, Jay seeks to suppress his custodial statements to police, his two recorded telephone conversations from jail with Khalida Thompson,

---

**5.** These two weapons are described in Counts 1, 2, 4, and 5 of the Indictment.

**6.** These weapons also are described in Count 2 of the Indictment.

and Thompson's statements to police when they searched her residence pursuant to a warrant.

### 1. There was reasonable suspicion for the officers to stop both the gray Chevrolet Caprice and the blue Chevrolet Celebrity on the pretext of investigating traffic violations.

Although Baker concedes there was a legal basis to support the pretext stops of the gray Chevrolet Caprice (for windows tinted too dark) and the blue Chevrolet Celebrity (for disobeying a red traffic light), Jay challenges the stop of the Caprice and seeks to exclude evidence of his identity established during that stop. Jay asserts the officers lacked probable cause to support this stop because the windows on the Caprice were, in fact, tinted within legal standards.

■ As the Ninth Circuit recently clarified in *United States v. Dorais*, however, the Fourth Amendment requires only reasonable suspicion to support an investigative traffic stop. *United States v. Dorais*, 241 F.3d 1124, 1130 (9th Cir.2001). "Reasonable suspicion is formed by 'specific, articulable facts which, together with objective and reasonable inferences, form the basis for suspecting that the particular person detained is engaged in criminal activity.'" *Id.* (quoting *United States v. Michael R.*, 90 F.3d 340, 346 (9th Cir.1996)). A court should consider the totality of the circumstances when determining whether reasonable suspicion existed. *United States v. Osborn*, 203 F.3d 1176, 1181 (9th Cir.), *cert. denied*, 530 U.S. 1237, 120 S.Ct. 2676, 147 L.Ed.2d 287 (2000).

■ In this case, three experienced police officers looked at the windows on the Caprice, and each officer believed the windows were tinted too dark. Although the windows actually may have been met legal standards pursuant to a scientific measurement, the photographs of the car corroborate the officers' testimony that the windows looked dark. In any event, the Court finds the officers' honest opinions concerning the degree of darkness were reasonable under the circumstances. The Court finds, therefore, these specific facts justified the officers' investigative stop for the pretextual purpose of determining just how dark the windows were.[7]

### 2. There was no probable cause to arrest Defendants without a warrant on June 22, 2001, when officers encountered Defendants on N.E. Portland Boulevard Court.

■ Police may arrest a person without a warrant if the arrest is supported by probable cause. *United States v. Valencia–Amezcua*, 278 F.3d 901, 906 (9th Cir. 2002). Probable cause to arrest exists when, "under the totality of the circumstances known to the arresting officers, a prudent person would have concluded that there was a fair probability ... [the defendants] had committed a crime." *Id.* (quoting *United States v. Garza*, 980 F.2d 546, 550 (9th Cir.1992)) (internal quotations and citations omitted).

In this instance, Officer Santos decided to arrest both Jay and Baker when he heard Officer Stradley describing via radio transmission Defendants' suspicious behavior as Jay prepared his vehicle for a quick departure from the duplex, Baker concealed something as he hurried down the driveway, and Jay and Baker sped away in the gray Chevrolet Caprice. The

---

7. In Jay's original Motion, he also challenged the pretext stop of the blue Chevrolet Celebrity. Jay did not pursue that issue in his Supplemental Memorandum. In any event, the Court finds there was ample justification to stop the Celebrity because its driver disobeyed the red traffic signal.

totality of the circumstances known to the officers at the time they arrested Baker and Jay support the following conclusions and the reasonableness of the officers' suspicions:

- On June 6, 2001, Baker, a convicted felon, drove the blue Chevrolet Celebrity.
- On June 16, 2001, a black male generally matching Baker's description drove the blue Chevrolet Celebrity, threatened Vaughn and Harris, and pointed a firearm at them in violation of Oregon law.
- If Baker was the one who pointed the gun at Vaughn and Harris on June 16, he also committed the crime of felon in possession of a firearm on June 16. Eyewitnesses, however, could not pick Baker's picture from a six-photo montage.
- On June 22, 2001, the blue Chevrolet Celebrity was parked at the duplex of Baker's girlfriend, Shawnta Foster, when Baker and Jay, also a convicted felon, left the duplex together in a gray Chevrolet Caprice.
- Foster lied to police on June 22, 2001, when she denied Baker had been to her house recently and was associated with the blue Chevrolet Celebrity.
- Foster warned Baker that police were asking about him in connection with the June 16 incident and that police might seek a search warrant for her duplex.
- Immediately after that warning, Baker and Jay returned to the duplex, intently searched the surrounding area for police who might be watching, and worked together to facilitate Baker's expedited removal of something wrapped in a clothing bundle from the duplex.
- Although these experienced officers actually suspected there was a gun or drugs or both in the bundle, there was

nothing distinctive about the shape of the bundle to suggest Baker was carrying a firearm, drugs, or evidence of a specific crime.

- After Jay got out of the gray Caprice on N.E. Portland Boulevard Court, he was carrying a plastic grocery bag. Officer Santos could see the bag contained baking soda boxes. Officer Santos knew baking soda is used to convert powder cocaine to rock cocaine.
- In addition, Officer Santos could see Baker, who was seated in the passenger seat of the Caprice, was preoccupied with something near his feet. Officer Santos feared the item might be a gun because Officer Santos believed Baker was the man who pointed a gun at Vaughn and Hayes and Baker might be trying to hide that gun from police.

The totality of these circumstances would have made obvious to a prudent police officer that criminal activity likely was afoot and that Jay and Baker were involved. Although the officers had clear authority to conduct an investigative stop and detention and to take reasonable measures for their own safety pursuant to *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the government disclaims any reliance on *Terry* in this case. Instead the government asserts there was probable cause at the time Officer Santos found the Caprice stopped on N.E. Portland Boulevard Court to arrest Baker without a warrant for the gun crime that occurred on June 16 and for being a felon in possession of a firearm on June 16. The government also contends there was probable cause to arrest both Baker and Jay without a warrant for gun and/or drug crimes on June 22, for being felons in possession of a firearm on June 22, for tampering with evidence on June 22,[8] and

---

8. Or.Rev.Stat. § 162.295(1) provides in part:

A person commits the crime of tampering with physical evidence if, with intent that it

for hindering prosecution on June 22.[9] The Court disagrees.

■ The Court finds there was no probable cause to arrest Baker for the June 16 incident at the time Officer Santos found the gray Caprice stopped on N.E. Portland Boulevard Court. Baker's use of the blue Chevrolet Celebrity ten days before the June 16 incident and Baker's apparent residence at Foster's duplex where the Celebrity was spotted on June 17 and June 22 merely connected him to the suspect vehicle. The timing of this association is too remote to make it probable that Baker was the man who pointed a gun at Vaughn and Hayes on June 16. In addition, even though there is a general similarity between Baker's appearance and the description of the suspect, the witnesses failed to identify Baker from a six-photo montage that included his image. Objectively, the failure of the witnesses to identify Baker reduced the probability that Baker was the man who threatened Vaughn and Hayes. Finally, when Foster warned Baker that the police were investigating the June 16 incident and might seek a warrant to search Foster's duplex for evidence that Baker was involved in the June 16 inci-

dent, Baker reacted immediately, quickly, and nervously by returning to the duplex, looking for police in the area, removing the bundle wrapped in yellow clothing, and departing the area at high speed. A prudent officer reasonably could conclude Baker removed the bundle from the duplex because it was contraband and he wanted to keep it from police. The shape of that bundle, however, was not distinctive, and the manner in which Baker carried it suggested it was heavy and awkward. The characteristics of the bundle were inconsistent with merely transporting a semi-automatic handgun that might have been the weapon involved in the June 16 incident. In addition, there was no objective indication at this point that a drug crime was underway such as an informant's tip, an association of the duplex with drugs, or any specific police observations. The Court, therefore, concludes the totality of the circumstances known to the officers when they encountered the gray Caprice on N.E. Portland Boulevard Court did not support a "fair probability" that Baker was the man who pointed the gun at Vaughn and Hayes on June 16, 2001.

be used, introduced, rejected or unavailable in an official proceeding which is then pending or to the knowledge of such person is about to be instituted, the person:
(a) Destroys, mutilates, alters, conceals or removes physical evidence impairing its verity or availability; or
(b) Knowingly makes, produces or offers any false physical evidence; or
(c) Prevents the production of physical evidence by an act of force, intimidation or deception against any person.

9. Or.Rev.Stat. § 162.325(1) provides in part:

A person commits the crime of hindering prosecution if, with intent to hinder the apprehension, prosecution, conviction or punishment of a person who has committed a crime punishable as a felony, or with the intent to assist a person who has committed

a crime punishable as a felony in profiting or benefiting from the commission of the crime, the person:
(a) Harbors or conceals such person; or
(b) Warns such person of impending discovery or apprehension; or
(c) Provides or aids in providing such person with money, transportation, weapon, disguise or other means of avoiding discovery or apprehension; or
(d) Prevents or obstructs, by means of force, intimidation or deception, anyone from performing an act which might aid in the discovery or apprehension of such person; or
(e) Suppresses by any act of concealment, alteration or destruction physical evidence which might aid in the discovery or apprehension of such person; or
(f) Aids such person in securing or protecting the proceeds of the crime.

■ On the other hand, there was a "fair probability" that Jay and Baker were moving something illegal and did not want the police to find it. The collective experience of Officers Stradley and Santos led them to suspect Baker was moving "dope," guns, or both because these are common crimes; because they suspected Baker used a gun on June 16; and because, in their experience, felons tend to hold on to their weapons rather than dispose of them. Although the honest "hunches" of these seasoned officers proved to be correct, they were not sufficient at the time to establish probable cause to arrest Jay and Baker for a drug crime.

On N.E. Portland Boulevard Court, the officers also became aware that Jay was carrying baking soda. This additional fact objectively supported a reasonable suspicion that a cocaine-manufacturing crime might be involved, and therefore, a *Terry* stop and investigative inquiry would have been warranted. As noted, however, the government does not contend the officers conducted a *Terry* stop on N.E. Portland Boulevard Court. Baking soda is not contraband, and there was no other indicia pointing to a drug crime. The Court, therefore, finds this additional fact is insufficient to tip the probabilities in favor of probable cause to arrest for a drug crime. Accordingly, the Court concludes the officers lacked probable cause at the scene on N.E. Portland Boulevard Court to arrest Baker and Jay for a drug crime.

The government also suggests there was probable cause to arrest Baker and Jay as felons in possession of firearms on June 22. Although the officers knew Baker and Jay were felons, they lacked any objective indicia that Baker concealed a gun in the yellow bundle he hurriedly carried from the duplex. The only suggestion that linked Baker to a gun on June 22 was the officers' suspicion that Baker was the man who pointed a firearm at Vaughn and

Hayes six days earlier. As noted, that incident was too remote in time to suggest Baker was hiding a gun that he might have used on June 16 in the bundle he carried out of the duplex on June 22. Following the same reasoning, the Court finds there was no probable cause to believe Jay was in possession of a firearm on N.E. Portland Boulevard Court. The Court, therefore, concludes there was no probable cause to support a warrantless arrest of Baker and Jay as felons in possession of a firearm at the scene on N.E. Portland Boulevard Court.

■ Finally, Officers Stradley and Santos testified they believed they also had probable cause to arrest Baker and Jay for tampering with evidence or hindering prosecution in violation of Oregon law. As noted, a person commits the crime of tampering with evidence in violation of Or.Rev. Stat. § 162.295(1) if the person "conceals or removes physical evidence impairing its . . . availability" with the intent that it be unavailable in an official proceeding then pending or, to the knowledge of such person, is about to be instituted. In short, there was no evidence known to the officers to support the specific intent requirement of this statute as to either Baker or Jay. At best, the officers had a reasonable suspicion Baker and Jay were concealing evidence of some unspecified crime in the hope of avoiding a future prosecution of some type.

■ Similarly, hindering prosecution is a specific-intent crime pursuant to Or.Rev. Stat. § 162.325(1). To arrest Baker or Jay for that offense, the officers needed probable cause to believe either that Baker or Jay intended to hinder the apprehension, prosecution, conviction or punishment of a person who had committed a felony or that Baker or Jay intended to assist a person who had committed a felony in profiting or benefiting from that crime. Because the

officers lacked probable cause to believe Baker or Jay had committed any specific felony, the Court finds the officers lacked probable cause to believe Baker or Jay had committed the crime of hindering prosecution of such a crime.

For all of these reasons, the Court concludes there was no probable cause to support the warrantless custodial arrests of Baker and Jay on N.E. Portland Boulevard Court on June 22, 2001.

**3. Although Jay voluntarily made statements while in custody, these statements are inadmissible because they were not sufficiently attenuated from his unlawful arrest.**

■ In *United States v. Patzer*, the Ninth Circuit reversed a district court's order denying a motion to suppress. 277 F.3d 1080 (9th Cir.), *rehearing denied*, 284 F.3d 1043 (9th Cir.2002). The court found Patzer's arrest for driving under the influence was unlawful under Idaho law, and the drug and gun crimes evidence obtained after his arrest, including Patzer's statements and physical evidence, were tainted and inadmissible as "fruit of the poisonous tree." *Id.* at 1083–84, 1086. The court recognized "[a] confession obtained during an unreasonable detention is subject to suppression unless it was sufficiently an act of free will to purge the primary taint of the unlawful invasion." *Id.* at 1084 (internal quotations and citations omitted). The court also noted, however, voluntary, custodial post-*Miranda* statements that do not violate the Fifth Amendment may be inadmissible under the Fourth Amendment. This Court, therefore, examines Jay's statements under both standards.

**a. Jay's post-arrest statements were voluntary and are admissible under the Fifth Amendment.**

■ After the officers took Jay into custody at gunpoint, handcuffed him, and placed him in the back of a marked police vehicle, they put away their weapons. When Officer Santos gave *Miranda* warnings to Jay, Jay initiated contact with Officer Stradley by asking to speak with him. While Jay still was in the back of the police car, Officer Stradley repeated the *Miranda* warnings. Jay was calm and cooperative and remained so throughout the afternoon and evening while police questioned him in custody at Northeast Precinct. Jay understood he did not have to speak with police. Indeed, he told Officer Santos as much before the arrest, and he invoked his rights several hours later after Officer Stradley informed Jay that his mother and a lawyer she hired for him did not want him to speak further with police. In addition, Jay obviously deliberated before deciding to consent to the search and tow of the gray Chevrolet Caprice. The officers treated Jay respectfully, did not threaten him, and conducted the questioning professionally. The officers made sure Jay had drinks and a blanket while he was in the holding cell.

Although Jay's custodial status was inherently coercive, the Court, nonetheless, concludes Jay voluntarily spoke with the officers at the scene on N.E. Portland Boulevard Court and again at Northeast Precinct. The Court is persuaded Jay made his statements freely because Jay was highly motivated to convince the officers he had nothing to do with the as-yet unidentified contraband that Baker brought to the gray Chevrolet Caprice.

**b. Because Jay's post-arrest custodial statements were tainted by and were not sufficiently attenuated from his unlawful arrest, they are inadmissible under the Fourth Amendment.**

■ In *United States v. Ramirez–Sandoval*, the Ninth Circuit set out three ex-

ceptions to the "fruit of the poisonous tree" doctrine that allow the admission of evidence derived from a Fourth Amendment violation: the "independent source" exception,[10] the "attenuated basis" exception, and the "inevitable discovery" exception.[11] 872 F.2d 1392, 1396 (9th Cir.1989). The government does not argue Jay's custodial statements are admissible under the independent source or inevitable discovery exceptions. "The 'attenuated basis' exception applies when the connection between the illegality and the challenged evidence has become sufficiently weak so as to dissipate the taint caused by the illegality." *Id.* at 1396 (citation omitted).

In *Patzer* the court weighed the following factors to determine whether a voluntary statement was tainted and inadmissible under the Fourth Amendment: (1) whether *Miranda* warnings were given before the statement, (2) the temporal proximity of the arrest to the statement, (3) the presence of intervening circumstances, and (4) the purpose and flagrancy of the official misconduct. 277 F.3d at 1085–86. Here the first and last factors weigh in favor of admissibility. Jay received two *Miranda* warnings before he gave his voluntary statements. In addition, there is no evidence the officers engaged in flagrant misconduct to exploit Jay's custodial status.[12] On the other hand, the remaining factors weigh heavily in Jay's favor. Both the length of Jay's custodial detention without probable cause and the absence of any intervening event (such as release, contact with a lawyer or family member, or a magistrate's probable cause review) did nothing to dissipate the coercive environment of the unlawful custodial arrest. As in *Patzer*, "there was no meaningful break in the chain of events between the unlawful arrest and ... [Jay's] custodial interrogation that would allow admission of ... his statements." *Id.* at 1085.

**4. Jay's otherwise voluntary consent to search the gray Chevrolet Caprice also is tainted by his unlawful arrest.**

■■■ For the same reasons the Court found Jay voluntarily made post-arrest statements to the police that did not violate the Fifth Amendment, the Court also concludes Jay voluntarily consented to a search of the gray Chevrolet Caprice. The Court, however, also finds there was no meaningful break in the chain of events between Jay's unlawful arrest and his consent to search the Caprice. To the extent the government relies on that consent, the Court suppresses the drugs, guns, and contraband the officers found when they searched the Caprice.

**5. The "good faith" exception to the exclusionary rule does not permit admission of the evidence seized pursuant to the Search Warrants.**

■■■ Officer Santos included in his Affidavit in Support of a Search Warrant a

---

**10.** "The 'independent source' exception operates to admit evidence that is actually found by legal means through sources unrelated to the illegal search." *Ramirez–Sandoval*, 872 F.2d at 1396 (citation omitted).

**11.** "The 'inevitable discovery' exception ... allows the introduction of illegally obtained evidence if the government can show by a preponderance of the evidence that the tainted evidence would inevitably have been discovered through lawful means." *Ramirez–Sandoval*, 872 F.2d at 1396 (citation omitted).

**12.** Although Jay points to the fact that Officer Stradley unsuccessfully sought a probation detainer from Jay's probation officer while Jay was detained at Northeast Precinct, this Court rejects any suggestion this is evidence that Officer Stradley engaged in "flagrant misconduct." To the contrary, the Court concludes Officer Stradley merely explored all lawful avenues available to him to pursue the developing investigation.

detailed summary of the statements Jay made voluntarily while in custody on N.E. Portland Boulevard Court and at Northeast Precinct. Although the Court finds Jay's unlawful arrest tainted these statements, "[t]he mere inclusion of tainted evidence in an affidavit does not, by itself, taint the warrant or the evidence seized pursuant to the warrant. A reviewing court should excise the tainted evidence and determine whether the remaining, untainted evidence would provide a neutral magistrate with probable cause to issue a warrant." *United States v. Vasey,* 834 F.2d 782, 788 (9th Cir.1987) (citations omitted). *See also United States v. Duran-Orozco,* 192 F.3d 1277, 1281 (9th Cir.1999).

When Jay's statements are considered among the totality of the circumstances described in the Affidavit, the Court finds, as did Judge Marcus, a strong showing of probable cause to search the gray Chevrolet Caprice and Foster's duplex. When the statements are excised, however, the Affidavit sets forth only those circumstances the Court already has concluded are insufficient to establish probable cause to arrest Jay and Baker for drug and/or gun crimes. The Court, therefore, also finds the excised Affidavit would not establish probable cause to search the gray Chevrolet Caprice and Foster's duplex for evidence of such crimes.

 Jay and Baker seek to exclude the evidence officers seized when they searched pursuant to the warrants issued by Judge Marcus on June 23, 2001. In response, the government argues this evidence is admissible because the "good-faith" exception to the exclusionary rule applies even if the Search Warrants were not supported by probable cause. The government relies on *United States v. Lightbourne,* 104 F.3d 1172 (9th Cir.1997); *United States v. Fowlie,* 24 F.3d 1059 (9th Cir.1994); *United States v. Brown,* 951 F.2d 999 (9th Cir.1991); and *United States*

*v. Michaelian,* 803 F.2d 1042 (9th Cir. 1986). According to these cases, the good-faith exception applies when a warrant is not facially deficient, when a magistrate is not misled by an officer's dishonesty or disregard for the truth, and when the magistrate acts as a neutral and detached judicial officer. Although the Court concurs the Search Warrants in this case were not facially deficient, Officer Santos's Affidavit accurately set forth the facts, and Judge Marcus acted as a neutral and detached magistrate, none of the cases on which the government relies involved an affidavit that depended on tainted evidence to establish probable cause.

On the other hand, in *Vasey,* a police officer conducted a warrantless search and presented tainted evidence to a magistrate who issued the search warrant. 834 F.2d at 789. The Ninth Circuit rejected the very argument the government makes here:

> [W]e conclude that the magistrate's consideration of the evidence does not sanitize the taint of the illegal warrantless search. A magistrate's role when presented with evidence to support a search warrant is to weigh the evidence to determine whether it gives rise to probable cause.... We therefore conclude that a magistrate's consideration does not protect from exclusion evidence seized during a search under a warrant if that warrant was based on evidence seized in an unconstitutional search. Accordingly, the good faith exception should not and will not be applied to the facts of this case.

*Id.* at 789–90. In *United States v. Gantt,* the court applied similar reasoning:

> The good-faith exception is applied when a magistrate erroneously issues a warrant but the officers involved are not expected to recognize the mistake. If the executing officers act in good faith

and in reasonable reliance upon a search warrant, evidence which is seized under a facially valid warrant which is later held invalid may be admissible. The Supreme Court's goal in establishing the good-faith exception was to limit the exclusionary rule to situations where the illegal behavior of officers might be deterred. The exclusionary rule is designed to deter police misconduct rather than legal errors of judges and magistrates.

The corollary of the above reasoning is that the exclusionary rule should not be applied where the violation is the fault of the officers. If there is no error on the part of the judiciary, the good-faith exception is inapplicable.

194 F.3d 987, 1005–06 (9th Cir.1999) (internal quotations and citations omitted).

In this case, Judge Marcus did not err. Although this Court is certain the officers acted in subjective good faith during rapidly evolving circumstances when they concluded there was probable cause to arrest Jay and Baker without a warrant, they, nonetheless, erred when they arrested Jay and Baker without probable cause. Accordingly, the good-faith exception to the exclusionary rule does not apply. The Court, therefore, must suppress the evidence seized pursuant to the June 23, 2001, Search Warrants for the gray Chevrolet Caprice and Foster's duplex.

**6. Jay's recorded telephone conversations with Khalida Thompson were sufficiently attenuated from his unlawful arrest to support probable cause for the June 25, 2001, Search Warrant for Thompson's residence.**

▮ As noted, the Court has found Jay's custodial statements to police at the scene of his arrest on N.E. Portland Boulevard Court and while he was in custody at Northeast Precinct were tainted by his unlawful arrest. The Court, however, finds no similar linkage between Jay's arrest and his personal telephone calls from jail to Thompson on an obviously-recorded telephone line. Because the officers did nothing to provoke Jay to make these calls, the Court concludes the calls are sufficiently attenuated from Jay's arrest and, therefore, the content of the calls are admissible. When Jay asked Thompson to dispose of the "you-know-what" he had removed from the gray Chevrolet Caprice and hidden under Thompson's bed, it was reasonable for the officers to infer that Jay, a convicted felon, was referring to a firearm. Officer Santos accurately added this information to an Addendum to his Affidavit in support of his request for a warrant to search Thompson's residence. Even if the "fruits" of Jay's unlawful arrest, including the results of the search of the gray Chevrolet Caprice, were excised from the Affidavits in support of the officer's application for a search warrant, there was sufficient information to establish probable cause to believe a gun belonging to Jay would be found at Thompson's residence. The Search Warrant for Thompson's residence issued by Judge Marcus on June 25, 2001, therefore, was valid, and the evidence seized from Thompson's residence is admissible. In addition, the Court does not find any basis to exclude the statements Thompson made to the officers who served that Warrant.

### CONCLUSION

For these reasons, the Court suppresses Jay's post-arrest custodial statements to police and all evidence seized pursuant to the June 23, 2001, Search Warrants. The Court, therefore, **GRANTS in part** Defendant Jay's Motion (# 54) and **GRANTS** Defendant Baker's Motion (# 57). The Court **DENIES in part** the remainder of Jay's Motion (# 54) to the extent Jay seeks suppression of (1) his identity estab-

lished in the pretext stop of the gray Chevrolet Caprice; (2) his recorded telephone conversations with Khalida Thompson; (3) the results of the June 25, 2001, Search Warrant of Thompson's residence; and (4) the statements Thompson made to police when they served that Warrant.

IT IS SO ORDERED.