**UNITED STATES of America,**
**Plaintiff—Appellee,**

v.

**Felix Fred AGUILA, Defendant—**
**Appellant.**

**No. 03–10223.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Dec. 2, 2003.

Decided March 22, 2004.

Fred Wallace Slaughter, Tucson, AZ, for Plaintiff–Appellee.

Rubin Salter, Jr., Esq., Law Office of Rubin Salter Jr., Tucson, AZ, for Defendant–Appellant.

Before: O'SCANNLAIN, HAWKINS and FISHER, Circuit Judges.

## MEMORANDUM [*]

Felix Aguila pled guilty to possession with intent to distribute marijuana in violation of 21 U.S.C. § 846 and conspiracy to possess with intent to distribute marijuana in violation of 21 U.S.C. § 841(a). Aguila contends that the warrantless search of his home violated the Fourth Amendment, and we agree.

## I

Agents Francisco Villafane and Oliver Lashley conducted an unreasonable search when they peered into the window of Aguila's home after Officers Cray and Cantu had already made contact with Aguila outside his residence and begun to question him. In circling the house, Villafane and Lashley were not attempting to contact the occupants of the house for questioning. *See United States v. Hammett*, 236 F.3d 1054, 1060 (9th Cir.2001); *United States v. Garcia*, 997 F.2d 1273, 1279 (9th Cir. 1993).[1]

Nor does the record indicate that they peered into Aguila's window for purposes of officer safety. Before Villafane looked in the window, he had ascertained that "no one was under any imminent threat" and had put his gun back in his holster. Similarly, Lashley had reslung his M–16 in a downward position and was no longer holding it when he looked in Aguila's window with his flashlight. Even though Lashley claims that his purpose for initially peering into the window was officer safety, looking into a window actually endangers officer safety because, as Villafane recognized, someone hiding inside can see the officer first and shoot him. Had the officers been truly concerned about safety, they could have surrounded the building and secured the perimeter without peering into the window. *See United States v. Duran–Orozco*, 192 F.3d 1277, 1281 (9th Cir.1999).

## II

■ Under the totality of the circumstances, Aguila's consent to search his home was not voluntary. Although Aguila was not formally placed in custody, 12 armed officers and agents – at least one carrying an M–16 rifle – raided the area immediately surrounding Aguila and his living quarters. Two officers accosted Aguila, who was standing outside his residence cooking tortillas at a ramada. The others fanned out around the nearby buildings, including Aguila's residence. Although the two officers questioning Aguila did not have their guns drawn, he could see other officers holding their guns in a low-ready position and carrying "submachine guns or something." Cray and Cantu neither read Aguila his *Miranda* rights

---

* This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Circuit Rule 36–3.

1. In *United States v. Barajas–Avalos*, 359 F.3d 1204 (9th Cir.2004), we recently held that Fourth Amendment protection "applies to the area immediately surrounding a home, not to an empty structure used occasionally as sleeping quarters." *Id.* at 1216. Specifically, we noted that there was "no evidence that [the defendant's] travel trailer was used as a permanent or temporary home" for the last 10 years. *Id.* Here, there is no dispute that the structure into which Villafane and Lashley peered was Aguila's permanent home.

nor informed him that he had the right not to consent. Given the overbearing circumstances confronting this poorly educated, "unsophisticated" suspect, the district court's finding that the government had met its burden of proving voluntary consent was clearly erroneous. *See Schneckloth v. Bustamonte,* 412 U.S. 218, 248, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *United States v. Reid,* 226 F.3d 1020, 1026–27 (9th Cir.2000) (listing and applying factors).

### III

Aguila's nephew, Tony Mattia, did not have actual authority to consent to the search of Aguila's home. Mattia lived in a separate residence. Although Mattia told Agent Manuel Ochoa that he stored his personal property in Aguila's home and had access to the house, the record does not indicate that Mattia had "joint access or control [of Aguila's home] for *most purposes.*" *Illinois v. Rodriguez,* 497 U.S. 177, 181, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990) (emphasis added); *see United States v. Impink,* 728 F.2d 1228, 1233 (9th Cir.1984). The government failed to meet its burden of establishing that Mattia had "common authority" over Aguila's home. *See Rodriguez,* 497 U.S. at 181.[2]

**REVERSED.**

---

2. Nothing Mattia said to Agent Ochoa conveyed apparent authority, because Ochoa was not led to believe any untrue, additional fact concerning the scope of Mattia's access or control over Aguila's residence. *See United States v. Fiorillo,* 186 F.3d 1136, 1144 (9th Cir.1999).