**UNITED STATES of America,
Plaintiff,**

v.

**Eric Eugene LUNDIN, Defendant.**

**Case No. 13–cr–00402–JST–1**

United States District Court,
N.D. California.

Signed June 26, 2014

William Frentzen, U.S. Attorney's Office, San Francisco, CA, for Plaintiff.

Re: ECF No. 28

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO SUPPRESS**

JON S. TIGAR, United States District Judge

## I. INTRODUCTION

Defendant Eric Eugene Lundin ("Defendant" or "Lundin") is charged with a single

count of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). ECF No. 1. Lundin now moves to suppress evidence and statements obtained by officers of the Humboldt County Sheriff's Office ("HCSO") and the Arcata Police Department ("APD") on April 23 and 24, 2013. Defendant's Motion to Suppress; Request for Evidentiary Hearing ("Motion"), ECF No. 28. The matter came for hearing May 30, 2014.

## II. BACKGROUND

### A. Factual Background

#### 1. Alleged April 22 Kidnapping and Assault

In response to a report of a kidnapping victim being treated in a hospital's emergency room in Arcata, California, HCSO Deputy Scott Aponte arrived at the hospital at approximately 12:30 a.m. on April 23, 2013 and interviewed Susan Hinds, the reported kidnapping victim. Declaration of Humboldt County Sheriff's Deputy Scott Aponte ("Aponte Decl.") ¶ 3 (ECF No. 32–2); Exh. A to Declaration of Frederick W. Anderson ("Anderson Decl."), at C0002 (ECF No. 30–1). According to Hinds, as relayed to Aponte, the following transpired during the evening of April 22, beginning at about 8:00 p.m. Exh. A to Anderson Decl., at C0002; Exh. A[1] to Declaration of Geoffrey Hansen ("Hansen Decl.") at C0093 (ECF No. 29–2).

Hinds was at her home while her son, Joseph Miller, was at the store. Exh. A to Hansen Decl., at C0093. Hinds opened her front door in response to a knock and saw Defendant Eric Lundin, known to Hinds as "Whitey," whom she thought of as a friend and who had served prison time

with Miller. *Id.* at C0094, C0110, C0122. Lundin grabbed Hinds by the neck, pushed his way into the residence, and accused Miller of stealing Lundin's marijuana that he grew in his home. *Id.* at C0094, 0112. Hinds said "[Lundin] grows pot. I guess he has a card, whatever." *Id.* at C0113. Lundin mentioned several times that his two daughters had been with him when he was robbed. *Id.* at C0116, C0122, C0133, C0150 (ECF Nos. 29–3 & 29–4).

While in Hinds' residence, Lundin made Hinds take pills Lundin described as methadone, which he told Hinds would cause her to overdose. *Id.* at C0095–96, 104–05 (ECF No. 29–2). He also pulled out two handguns from his pockets (a silver one and a larger black one), put one of the guns against Hinds' temple, had her call Miller to tell him to come home, broke Hinds' television by striking it with a gun, and broke Hinds' cellphone by throwing it across the room. *Id.* at C0101–102, 106.

During this series of events, according to Hinds, Lundin told Hinds multiple times she was going to die and that he "leaves no witnesses." *Id.* at C0096. Lundin also stated, "You know that's what us Mongols do ... [w]e leave no witnesses—none of them." *Id.* at C0105–06. During her interview with Deputy Aponte, Hinds asked Aponte, "Is the Mongols bad?" to which Deputy Aponte responded, "It's a, uh, motorcycle gang—kind of like the Hell's Angels. They're like the Hell's Angels' rivals." *Id.* at C0134 (ECF No. 29–3).

Next, as recounted by Hinds to Deputy Aponte, Lundin forced Hinds into his truck and drove out of the trailer park in which Hinds lived. *Id.* at C096 (ECF No. 29–2). They passed Miller on their way out, at

---

1. The court refers to this as "Exhibit A," as it is described on the document itself, *see* ECF No. 29–2 at ECF Page No. 1 of 24, although the transcript of the interview is labeled "Exhibit B" in the ECF docketing system.

which point Lundin told Hinds to "[w]ave good-bye to your son. You'll never see him again." *Id.* at C0108. Lundin also ordered Hinds take more of the supposed methadone pills. *Id.* at C0096. Later, Lundin contacted Miller over the phone and during their conversation, Lundin appeared to change his mind regarding Miller's involvement in the theft of Lundin's marijuana. *Id.* at C0109–10. Lundin then returned Hinds to her trailer park and explained that he had no intention of killing her but only wanted to scare her. *Id.* at C0110, 115.

Shortly after concluding his interview with Hinds, Aponte interviewed Miller, who was also present at the hospital. Exh. A to Hansen Decl., at C0147–160 (ECF No. 29–4). Miller stated that "I guess someone went to rob his [Lundin's] house," and that "all . . . [Lundin's] weed's there. He's doing a grow. He's a Mongol." *Id.* at C0147. Miller described receiving Lundin's call from his truck at about 10:00 p.m. *Id.* at C0149. Miller reported that Lundin told him he was "going to get his Mongol brothers to get [Miller] and whatever." *Id.* at C0150.

### 2. April 23 Search, Seizure and Questioning

Deputy Aponte then "contacted dispatch and requested a BOLO ["Be On the Lookout"] be issued for Lundin." Aponte Decl. ¶ 6 (ECF No. 34–2); Exh. A to Anderson Decl., at C0003 (ECF No. 30–1). Deputy Aponte "also requested that . . . [Lundin] be arrested pursuant to Cal.Penal Code § 836 for burglary, false imprisonment, kidnapping, vandalism, brandishing a firearm, administering a drug to commit a felony, administering a controlled substance, and battery." Aponte Decl. ¶ 6; Exh. A to Anderson Decl., at C0003. "At this time . . . [Deputy Aponte] believe[s] that there was ample probable cause to seek and obtain a warrant for Lundin's arrest." Aponte Decl. ¶ 7. Deputy Aponte appears to have begun preparing an incident report on these events at 2:23 a.m. Exh. A to Anderson Decl., at C0001.

After receiving the BOLO, APD Officer Matthew O'Donovan drove to Lundin's home. Declaration of Arcata Police Officer Matthew O'Donovan ("O'Donovan Decl.") ¶¶ 3–4 (ECF No. 34–1). Officer O'Donovan observed a vehicle that had been described as Defendant's, and saw that "[t]he lights were on inside the home." *Id.* ¶ 4. O'Donovan called for backup and was joined by APD Officer Jeremiah Kasinger, APD Sergeant Keith Altizer, and HCSO Deputy Matthew Tomlin. *Id.* ¶ 5. "At approximately 0354 hours," Officers O'Donovan and Kasinger and Deputy Tomlin approached the front door. *Id.* ¶ 5. Officer O'Donovan knocked on the door, waited about thirty seconds, and knocked again more loudly. *Id.* ¶ 6.

After the second knock, Officer O'Donovan and Deputy Tomlin "heard a series of loud crashes coming from the rear of the residence." *Id.* ¶ 7; *see also* Exh. A to Anderson Decl., at C0008 ( ECF No. 30–1) (incident report of Deputy Tomlin that "I heard a crashing noise to the rear of the residence."). The officers "loudly identified [them]selves as police, and shouted for Defendant to put his hands in the air and come out slowly." O'Donovan Decl. ¶ 7; *see also* Exh. A to Anderson Decl., at C0008 (incident report of Deputy Tomlin that "I started shouting at whoever was on the back patio to come out with their hands up"). "The fence surrounding the backyard was tall, but . . . [the officers] could hear Defendant moving around in the backyard." O'Donovan Decl. ¶ 8. "Defendant exited the backyard and was taken into custody by Deputy Tomlin." *Id.* Deputy Tomlin directed Lundin into a prone position on the ground, placed him into handcuffs, and had him sit in Deputy

Tomlin's car. Exh. A to Anderson Decl., at C0008.

Officers O'Donovan and Kasinger then searched the home and the backyard. *Id.* ¶ 9. "While exiting the home," Officer O'Donovan "noticed a clear plastic freezer bag that contained two firearms—a black semiautomatic and a silver revolver." *Id.* ¶ 10. "The handguns were in plain view within arm's reach of the common walkway proceeding from the gate where we entered the backyard." *Id.* Deputy Tomlin photographed the bag and picked it up, and Deputy Aponte seized the bag when he arrived on the scene. *Id.* ¶¶ 10–11; Aponte Decl. ¶ 9; Exh. A to Anderson Decl., at C0009.

At the scene, an unidentified officer stated that Lundin is a "retired Mongol." Exh. A to Hansen Decl., at C0163 (ECF No. 29–4). Deputy Aponte asked Lundin "you want to go by Whitey or your, uh—your regular name?" and Lundin responded "[w]hatever you want to call me." *Id.* at C0164. Deputy Aponte then read Lundin his *Miranda* rights, which Lundin invoked. *Id.* at C0164–65.

### 3. April 24 Search

On the morning of April 24, HCSO Deputy Todd Fulton prepared an affidavit, statement of probable cause, and warrant application to search Lundin's home, which was signed by Humboldt Superior Court Magistrate Judge Bruce Watson at 8:55 a.m. Exh. A to Anderson Decl., at C0012; Exh. B to Anderson Decl. (ECF No. 30–4). Deputy Aponte and other officers then executed the warrant and seized numerous items, including guns, cellular phones, a prescription pill bottle for methadone, computers and hard drives, and various Mongol paraphernalia. Aponte Decl. ¶ 12; Exh. A to Anderson Decl., at C0004 (ECF No. 30–1).

Defendant was initially charged with state crimes in Humboldt County, and those charges were later dismissed. Defendant was charged with the current indictment on June 20, 2013.

### B. Legal Standards

Defendant's motion to suppress is brought on three grounds: that officers conducted an unreasonable warrantless search on April 23, that officers conducted an unreasonable warranted search on April 24, and that officers obtained statements from Lundin in violation of his *Miranda* rights on April 24.

#### 1. Warrantless Searches

■ The Fourth Amendment protects individuals against unreasonable searches and seizures. U.S. Const. Amend. IV. "Searches and seizures that offend the Fourth Amendment are unlawful and evidence obtained as a direct or indirect result of such invasions is considered 'fruit of the poisonous tree' and is inadmissible under the exclusionary rule." *United States v. McClendon,* 713 F.3d 1211, 1215 (9th Cir.2013) (citing *Wong Sun v. United States,* 371 U.S. 471, 484–87, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963)). Searches of a person's home are presumably unreasonable without a warrant, and the "burden of proving that a warrantless search or seizure falls within an exception to the warrant requirement is on the government." *United States v. Scott,* 705 F.3d 410, 416 (9th Cir.2012).

#### 2. Warranted Search

■ Courts must show deference to a magistrate judge's determination of probable cause. *Illinois v. Gates,* 462 U.S. 213, 236, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). Nonetheless, courts are "not to defer to a warrant based on an affidavit that does not provide the magistrate with a substantial basis for determining the existence of probable cause." *United States v. Leon,*

468 U.S. 897, 915, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984) (internal quotation omitted). The affidavit supporting a search warrant must show a " 'fair probability that contraband or evidence of a crime [would] be found in' defendant's home." *United States v. Hill,* 55 F.3d 479, 480 (9th Cir.1995) (alteration in original) *(quoting Gates,* 462 U.S. at 238, 103 S.Ct. 2317). Even when probable cause is actually lacking, suppression of evidence is not required if the "search [was] conducted in good faith reliance upon an objectively reasonable search warrant." *United States v. Crews,* 502 F.3d 1130, 1135–36 (9th Cir. 2007) *(citing Leon,* 468 U.S. at 925, 104 S.Ct. 3405).

### 3. *Miranda* Violations

■ " '[T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination,' a requirement commonly satisfied by delivery to the defendant of the familiar 'Miranda warnings.' " *Dyer v. Hornbeck,* 706 F.3d 1134, 1138 (9th Cir. 2013) *cert. denied,* —— U.S. ——, 134 S.Ct. 82, 187 L.Ed.2d 64 (U.S. 2013) *(quoting Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)).

### III. ANALYSIS

Defendant argues that the evidence seized on April 23 must be suppressed, for two reasons: (1) that the officers' April 23 entrance onto Defendant' porch was an unreasonable search, and so all "fruits" of that search must be suppressed, and (2) that the officers' April 23 search of the Defendant's backyard and house was an unreasonable search, and so the evidence seized during that search must be suppressed. Defendant also argues that deficiencies in the April 24 warrant require suppression of evidence seized on April 24, or at least an evidentiary hearing before that evidence can be admitted. Finally, Defendant argues that statements obtained in violation of Defendant's *Miranda* rights must also be suppressed. The court addresses each of these arguments in turn.

### A. Entrance to Porch

■ The area "immediately surrounding and associated with the home"—i.e., the home's curtilage—is considered part of the home itself for Fourth Amendment purposes. *Florida v. Jardines,* —— U.S. ——, 133 S.Ct. 1409, 1414, 185 L.Ed.2d 495 (2013) *(quoting Oliver v. United States,* 466 U.S. 170, 182, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984)). "The front porch is the classic exemplar" of curtilage. *Jardines,* 133 S.Ct. at 1415. In its opposition brief, the government "does not dispute that Defendant had a Fourth Amendment interest in the 'curtilage' surrounding his home." Government's Opposition to Defendant's Motion to Suppress ("Opp.") at 6:8–9, ECF No. 34. "Nor does the government dispute that Defendant's front porch was curtilage and therefore subject to Fourth–Amendment protection." *Id.* at 6:9–10.[2]

---

**2.** Notwithstanding the unambiguous concession in its brief, counsel for the government changed course at the hearing and disputed that the area immediately outside Defendant's front door was constitutionally protected "curtilage." The government waived that argument by conceding it in its brief. Even had the government not conceded the point, how-ever, the court would reach the same conclusion independently. Applying the factors from *United States v. Dunn,* 480 U.S. 294, 300–01, 107 S.Ct. 1134, 94 L.Ed.2d 326 (1987), the court concludes that the semi-enclosed, semi-obscured front porch area underneath the building's balcony and immediately outside the front door qualifies as an

■ Ordinarily, "[w]hen 'the Government obtains information by physically intruding' on persons, houses, papers, or effects, 'a 'search' within the original meaning of the Fourth Amendment' has 'undoubtedly occurred.'" *Jardines,* 133 S.Ct. at 1414 *(quoting U.S. v. Jones,* —— U.S. ——, 132 S.Ct. 945, 950–951, n. 3, 181 L.Ed.2d 911 (2012)). However, it is "a firmly-rooted notion in Fourth Amendment jurisprudence" that a resident's expectation of privacy is not violated, at least in many circumstances, when an officer intrudes briefly on a front porch to knock on a door in a non-coercive manner to ask questions of a resident. *U.S. v. Crapser,* 472 F.3d 1141, 1156 (9th Cir.2007) *(citing U S. v. Cormier,* 220 F.3d 1103, 1109 (9th Cir.2000)). The rationale for permitting this intrusion is that, in our society, the resident of a home typically extends to strangers an "implicit license ... to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave." *Jardines,* 133 S.Ct. at 1415. "Thus, a police officer not armed with a warrant may approach a home and knock, precisely because that is 'no more than any private citizen might do.'" *Id.* at 1416 *(quoting Kentucky v. King,* —— U.S. ——, 131 S.Ct. 1849, 1862, 179 L.Ed.2d 865 (2011)). This is referred to as the "'knock and talk' exception to the warrant requirement." *United States v. Perea–Rey,* 680 F.3d 1179, 1187 (9th Cir.2012).

■ The United States argues that the officers' approach to the front door qualifies as a permissible "knock and talk" because their actions fell within the scope of a stranger's implied license to knock on Lundin's door. The court concludes that two compelling factors weigh in favor of concluding that the officers' actions did *not*

fall within the "knock and talk" exception. First, the officers' actions objectively indicate that their purpose was to locate and arrest Lundin, not to talk to him. Second, the approach took place at 4 a.m., and there are no facts indicating that Lundin extended an implied license to strangers to visit him at that hour. Taken in tandem, these two factors indicate that officers exceeded the scope of any implied license to intrude into Lundin's curtilage on the facts of this case.

**1. The Officers' Purpose**

In *Jardines,* the Supreme Court held that "the government's use of trained police dogs to investigate the home and its immediate surroundings is a 'search' within the meaning of the Fourth Amendment." 133 S.Ct. at 1417–18. The United States suggests that *Jardines* should be limited to its facts, and that the officers' transgression in that case was the use of the dogs rather than the intrusion onto the property. But if that were the essence of *Jardines'* holding, the Supreme Court could simply have applied its previous holding in *Kyllo v. United States,* 533 U.S. 27, 40, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001), that using a thermal imager "to explore details of the home that would previously have been unknowable without physical intrusion" is a presumptively unreasonable search, even when conducted from a public street. "It is not the dog that is the problem, but the behavior that here involved use of the dog." *Jardines,* 133 S.Ct. at 1416, n. 3.

Instead of focusing on the tools the officers used to conduct their search, the *Jardines* court's analysis focused almost entirely on the officers' purposes and actions when entering the area around the home:

area the home's resident "reasonably may expect ... should be treated as the home

itself." *See* Exh. A to Declaration of Eric Lundin, ECF No. 31–1.

But introducing a trained police dog to explore the area around the home in hopes of discovering incriminating evidence is something else. There is no customary invitation to do *that*. An invitation to engage in canine forensic investigation assuredly does not inhere in the very act of hanging a knocker. To find a visitor knocking on the door is routine (even if sometimes unwelcome); to spot that same visitor exploring the front path with a metal detector, or marching his bloodhound into the garden before saying hello and asking permission, would inspire most of us to— well, call the police. *The scope of a license—express or implied—is limited not only to a particular area but also to a specific purpose.* Consent at a traffic stop to an officer's checking out an anonymous tip that there is a body in the trunk does not permit the officer to rummage through the trunk for narcotics. Here, the background social norms that invite a visitor to the front door do not invite him there *to conduct a search.* The State points to our decisions holding that the subjective intent of the officer is irrelevant. *See Ashcroft v. al–Kidd,* —— U.S. ——, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011); *Whren v. United States,* 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). But those cases merely hold that a stop or search that is objectively reasonable is not vitiated by the fact that the officer's real reason for making the stop or search has nothing to do with the validating reason. Thus, the defendant will not be heard to complain that although he was speeding the officer's real reason for the stop was racial harassment. *See id.,* at 810, 813, 116 S.Ct. 1769. Here, however, the question before the court is precisely whether the officer's conduct was an objectively reasonable search. As we have described, that depends upon whether the officers had an implied license to enter the porch, which in turn *depends upon the purpose for which they entered.* Here, their behavior *objectively reveals a purpose to conduct a search,* which is not what anyone would think he had license to do.

133 S.Ct. 1409 at 1416–17 (all emphases after the first added). After this analysis, it is impossible to conclude that the officers' intent is irrelevant to the inquiry of whether the officers acted within the scope of an implied license to visit the home. After *Jardines,* the officers' purpose, as revealed by an objective examination of their behavior, is clearly at least an important factor.

Just as the behavior of the officers in *Jardines* "objectively reveals a purpose to conduct a search," 133 S.Ct. at 1417, the behavior of the officers here objectively reveals a purpose to locate Defendant so that the officers could arrest him. Deputy Aponte had put out a request that Lundin be arrested; he believed that the officers already had probable cause for such an arrest; and the officers who arrived at the home were responding to Deputy Aponte's BOLO. Even before *Jardines,* the Ninth Circuit held that "at most, the knock and talk exception authorizes officers to enter the curtilage to initiate a consensual conversation with the residents of the home." *Perea–Rey,* 680 F.3d at 1189. Under the circumstances of this case, it is very difficult to imagine why the officers would have been seeking to initiate a consensual conversation with Lundin to ask him questions at four o'clock in the morning. Indeed, at oral argument, when asked the purpose of the officers' visit, counsel for the United States offered no purpose other than to find Lundin.

Just as the officers' clear purpose in *Jardines*—to search the curtilage for evidence—could not be pursued without a

warrant, so too was the officers' clear purpose in this case—to arrest a suspect within his home—a goal whose attainment requires a warrant. *See Payton v. New York,* 445 U.S. 573, 601–02, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). Even if the officers' intent was only to find out whether Lundin was at home, that purpose was essentially the same as that possessed by the *Jardines* officers: to search for information and evidence within an area protected by the Fourth Amendment.

It is unclear whether *Jardines* held that the officers' objectively discernible purpose is a *dispositive* factor in analyzing whether an officers' visit falls within the scope of a lawful knockand-talk. For example, imagine that a defendant leaves a gun on his front porch, in a spot where it is plainly visible to anyone on the porch, but is hidden behind a potted plant and therefore invisible to anyone standing on the sidewalk. If an officer approaches the front steps of the house at high noon, and sees the gun lying on the floor of the porch, is he prohibited from seizing the gun as evidence? After *Jardines,* does the answer to this question hinge on his objectively discernible intentions: if he intended to knock on the door to ask questions of the occupants, he may seize the gun, but if he intended to look for evidence, he may not?

That question may be presented by another case. To resolve this case, the court notes only that the fact that the officers' purpose was to locate Lundin and arrest him is at least a significant factor weighing in favor of finding that the approach was not permissible without a warrant.

### 2. The Time of the Search

Besides the officers' manifest intent, the other significant factor here is the time of the officers' visit: four o'clock in the morning, a time at which most residents do not extend an implied license for strangers to visit. On several occasions, courts have emphasized that the implied license to visit is generally understood to extend during daylight hours. *See, e.g., Crapser,* 472 F.3d at 1146 *(quoting Davis v. U.S.,* 327 F.2d 301, 303 (9th Cir.1964) ("[t]here is no rule of private or public conduct which makes it illegal per se, or a condemned invasion of the person's right of privacy, for anyone openly and peaceably, *at high noon,* to walk up the steps and knock on the front door of any man's 'castle' with the honest intent of asking questions of the occupant thereof") (emphasis added). In *Jardines,* all nine justices indicated some degree of agreement with the proposition. *See Jardines,* 133 S.Ct. at 1422 (Alito, J., dissenting) ("Nor, as a general matter, may a visitor come to the front door in the middle of the night without an express invitation"); *see also id.* at 1416, n. 3 (majority op.) ("the dissent quite rightly relies upon" the fact that a typical person would react to certain intrusions with great alarm "to justify its no-night-visits rule").

"A license may be implied from the habits of the country," *id.* at 1415 *(quoting McKee v. Gratz,* 260 U.S. 127, 136, 43 S.Ct. 16, 67 L.Ed. 167 (1922) (Holmes, J.), and it is stating the obvious to observe that the "habits of the country" do not include making uninvited visits at 4:00 a.m. Perhaps one can imagine the case where a visit at that hour is constitutionally reasonable: when the evidence shows that a resident regularly receives visitors at that hour, for example, or if a suspect can clearly be seen from a public vantage point to be awake and active. But the court need not (and does not) reach that question, because here the evidence does not show that it was anything other than unusual, and constitutionally unreasonable, for officers to visit Lundin's home at 4:00 a.m.

The government does offer one piece of evidence in support of the idea that Lundin might have expected a visit at that

hour: Deputy Tomlin's statement in his report that, sometime around that time, Officer O'Donovan "advised him that he located Lundin's truck which had arrived home sometime within the last hour." Exh. A to Anderson Decl., at C008, ECF No. 30–1. But there are two problems with this evidence. First is that this statement, on its own, is hearsay and lacks foundation. In his declaration, Officer O'Donovan does not claim to have known how recently the car had arrived, saying only "I drove to Defendant's address, where I observed a 2005 maroon Dodge pickup ... that had been described as Defendant's vehicle." O'Donovan Decl. ¶ 4. At oral argument, counsel provided no explanation of how the officers knew Lundin had recently arrived. More importantly, the fact that a resident arrives home at 3:00 a.m., standing alone, is scant indication that he wishes to entertain visitors at 4:00 a.m. A more reasonable conclusion is that, having come home at a late hour, he wishes to sleep.

O'Donovan does declare that "[t]he lights were on inside the home." *Id.* But the court cannot conclude that merely by leaving the lights on, the resident of a home extends an implied license for strangers to visit at 4 a.m. The fact that the entry onto the front porch took place at 4 a.m. is another compelling factor weighing in favor of the conclusion that the officer's approach to the door exceeded the scope of a licensed visit.

### 3. Conclusion

Although the purpose and timing of the officers' visit were both inconsistent with a "knock and talk," there is some evidence that pushes the other way. For example, officers did not identify themselves as police, and did not "demand that the occupants open the door." *United States v. Winsor,* 846 F.2d 1569, 1573, n. 3 (9th Cir.1988) (en banc); *see also Cormier,* 220 F.3d at 1109 (holding a "knock and talk" reasonable because, *inter alia,* the officer "never announced that she was a police officer while knocking nor did she ever compel Cormier to open the door under the badge of authority," and "[b]ecause there was no police demand to open the door"). The officers also only knocked twice, and were not "unreasonably persistent in ... [their] attempt to obtain access to" the resident of the dwelling. *Cormier,* 220 F.3d at 1109 (citing *U.S. v. Jerez,* 108 F.3d 684, 691–92 (7th Cir.1997)).

But while these facts might tip the balance in a closer case, here they are insufficient to render the officers' 4:00 a.m. visit constitutional. By entering onto Lundin's curtilage at four in the morning for the purpose of locating him to arrest hi m, the officers engaged not in in a lawful "knock and talk" but rather in a presumptively unreasonable search. Since the government has not demonstrated that any exception to the warrant requirement applies, the search was unconstitutional.

For this reason, all evidence obtained in the April 23 search of Lundin's backyard and home must be suppressed as the fruits of the unconstitutional approach onto Lundin's curtilage. From the front porch, officers were able to hear the sounds of Lundin from within the building. The government has not met its burden to demonstrate that the officers could have heard those sounds from beyond Lundin's curtilage. It was only by hearing those sounds that the officers were able to make any claim to lawfully obtaining the items within his home on April 23. With the exception of the "inevitable discovery" doctrine (which the court concludes at III–B–3, *infra,* does not apply), all of the officers' arguments for the legality of the April 23 search stem from the noises the officers' heard within. If the officers "gain entry to premises by means of an actual or

threatened violation of the Fourth Amendment," they cannot invoke the "exigent circumstances" doctrine. *King*, 131 S.Ct. at 1862. And the officers' claim to have effected a lawful "protective sweep" requires them to detain Lundin, which they were only able to do because they were able to hear that he was in the backyard.

## B. April 23 Search of Backyard and Home

Even if the approach to the front porch were constitutional, the court would still conclude that the items seized on April 23 must be suppressed because the officers' later actions also violated the Fourth Amendment.

On April 23, the officers searched Lundin's apartment, an interior hallway, and the enclosed back patio of the apartment, which was enclosed behind a high fence. Exh. A to Anderson Decl., at C009 (ECF No. 30–1); O'Donovan Decl. ¶¶ 8–10. The United States does not dispute that these areas are all either part of the home or its "curtilage," and that officers may not search those areas without a warrant unless a recognized exception to the warrant requirement applies. *See Sims v. Stanton*, 706 F.3d 954, 959–60 (9th Cir.2013), *reversed on other grounds by Stanton v. Sims*, —— U.S. ——, 134 S.Ct. 3, 7, 187 L.Ed.2d 341 (2013). And the United States concedes that the officers lacked a warrant. But the government argues, in the alternative, that three different exceptions to the warrant requirement apply. The "burden of proving that a warrantless search or seizure falls within an exception to the warrant requirement is on the government." *Scott*, 705 F.3d at 416. The court addresses each of the government's arguments in turn.

### 1. Protective Sweep/Search

The United States first argues that the search of the backyard was legal because it was a "protective sweep incident to arrest." At the beginning of this analysis, some careful taxonomy is in order. Ninth Circuit authority draws a fine distinction between "a protective sweep in conjunction with an in-home arrest" and a "protective search incident to arrest." *United States v. Lemus*, 582 F.3d 958, 963, n. 2 (9th Cir.2009). Officers may conduct a "protective *search* incident to the arrest" without probable cause or reasonable suspicion, but may only search areas that " 'immediately adjoin[ ]' the area of arrest ... 'from which an attack could be immediately launched.' " *Lemus*, 582 F.3d at 963 *(quoting Maryland v. Buie*, 494 U.S. 325, 335, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990)). Under *Lemus's* reading of *Buie*, officers may conduct a "protective *sweep*" of a somewhat larger area, but only on the basis of "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Buie*, 494 U.S. at 334, 110 S.Ct. 1093.

In its papers, the United States calls the officers' actions a "protective sweep incident to arrest," cites "protective sweep" cases, and argues that the officers had reasonable suspicion to conduct the sweep. *See* Opp. 10–11, ECF No. 34. At oral argument, however, counsel for the United States argued that both doctrines might apply.

As counsel conceded, however, under either doctrine, the officers' detention of the suspect must be lawful for the protective search or sweep to be lawful. Therefore, the lawfulness of the detention is one of the elements the government must prove to establish the applicability of either the "protective search" or "protec-

tive sweep" exceptions to the warrant requirement.

In light of "the overriding respect for the sanctity of the home that has been embedded in our traditions since the origins of the Republic," it is well established that officers may not enter a suspect's home to arrest him without a warrant. *Payton*, 445 U.S. at 601–02, 100 S.Ct. 1371. The rule applies "inside a home or its curtilage." *United States v. Struckman*, 603 F.3d 731, 747 (9th Cir.2010). The United States does not dispute that Lundin was within his home's curtilage at the time he was told to put his hands in the air and come out slowly. *See* O'Donovan Decl. ¶ 8 ("we could hear Defendant in the backyard").

The United States argues that "Defendant voluntarily opened the gate to the backyard and came out himself." Opp. 11. Although it is not spelled out in the papers, it is presumably the United States' position that, if Lundin left his home voluntarily, the officers were permitted to then arrest him on public property, since they had probable cause to believe he had engaged in criminal activity.

But the government's description of the exit as "voluntary" is irreconcilable with the record. Officer O'Donovan states specifically that the officers "loudly identified [them]selves as police, and shouted for Defendant to put his hands in the air and come out slowly." O'Donovan Decl. ¶ 7. Deputy Tomlin states that he "started shouting at whoever was on the back patio to come out with their hands up." Exh. A to Anderson Decl., at C0008, ECF No. 30–1.

█ A seizure occurs when a "reasonable person would not have felt free to disregard ... [ an officer's] directions, end

the encounter ... and leave the scene." *United States v. Washington*, 490 F.3d 765, 774 (9th Cir.2007) (*citing Florida v. Royer*, 460 U.S. 491, 501–02, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983)). No reasonable person in Lundin's position would have felt free to disregard the officers' orders that he come out with his hands up. Lundin was seized at the moment the officers issued that command. And at that time, he was within the curtilage of his home. If officers may not arrest a suspect in his home without a warrant, it follows necessarily that they cannot order him to leave his home so that he may be arrested without a warrant.

It is plain from the record that Lundin did not "voluntarily" exit his home's curtilage. The United States provides no argument that would permit such an in-home seizure to occur without a warrant. Since the United States has failed to demonstrate that it constitutionally seized Lundin, it has failed to meet its burden of demonstrating the applicability of either the "protective sweep" or "protective search" exceptions to the warrant requirement.[3]

### 2. Exigent Circumstances

█ Second, the United States maintains that the warrantless search of the background was permissible under the "exigent circumstances" exception to the warrant requirement. "One well-recognized exception [to the warrant requirement] applies when 'the exigencies of the situation' make the needs of law enforcement so compelling that [a] warrantless search is objectively reasonable under the Fourth Amendment.'" *King*, 131 S.Ct. at 1856 (*quoting Mincey v. Arizona*, 437 U.S.

---

**3.** Notably, the United States does not argue that the officers' command was a constitu-

tional Terry stop. Instead, it argues instead that no seizure occurred.

385, 394, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978)).[4]

 " '[E]xigent circumstances,' include the need to protect an officer or the public from danger, the need to avoid the imminent destruction of evidence, when entry in 'hot pursuit' is necessary to prevent a criminal suspect's escape, and to respond to fires or other emergencies.' " *Washington*, 387 F.3d at 1071, n. 10 (*quoting U.S. v. Brooks*, 367 F.3d 1128, 1133, n. 5 (9th Cir.2004)). If those circumstances apply, the guns would not need to be suppressed, since "the police may seize any evidence that is in plain view during the course of their legitimate emergency activities." *United States v. Stafford*, 416 F.3d 1068, 1076 (9th Cir.2005). The United States argues that the first and second of these circumstances—protection from danger, and destruction of evidence—justify the warrantless search. The court addresses each argument in turn.

### a. Protection from Danger

In its papers, the government argues that the search of the backyard was permissible because "[o]fficers here were justifiably concerned that Defendant, whom they reasonably believed to be armed, was dangerous and would attempt to harm them or others." Opp. 12:17–18. This argument is a poor fit for the facts, because the officers did not discover and seize the guns until they had already seized Lundin. "[T]he police may seize any evidence that is in plain view during the course of their legitimate emergency activities," *Stafford*, 416 F.3d at 1076, but the legitimate emergency activity of neutralizing the threat from Lundin had already been completed when the officers entered the backyard and seized the guns they found there. Lundin was handcuffed and in the back of a police car.

At the hearing, the government argued instead that the officers reasonably believed that individuals *other than* Lundin were inside the home and might have posed a danger to the officers. The government did not make that argument in its papers, and Defendant did not have an opportunity to address it before the hearing.[5] But in any case, the government cites no cases suggesting that the government is entitled to invoke protection from danger as an exigent circumstance under the facts of this case.

In *Minnesota v. Olson*, 495 U.S. 91, 100, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990), the United States Supreme Court considered the Minnesota Supreme Court's holding that, in considering whether one of the "exigent circumstance" factors apply, "in the absence of hot pursuit there must be at least probable cause to believe that one or more of the other factors justifying the

---

4. Since, as discussed at III–A, *supra*, the officers here created the claimed exigency by intruding into Lundin's curtilage without a warrant and in excess of the implied license to visit, the United States may not invoke the "exigent circumstances" exception to the warrant requirement. Like the rest of III–B, this analysis assumes *arguendo* that the intrusion onto the front porch was permissible.

5. The United States does discuss the possibility of a threat from others within the house in the portion of its brief arguing that there was sufficient reasonable suspicion to conduct a "protective sweep." Opp. 10–11. The court

does not address that argument because it concludes that, even if the officers had reasonable suspicion of danger, they did not lawfully detain Lundin. *See* III–B–1, *supra*. To consider the broadest possible consideration of the government's arguments, the court herein transposes some of the government's arguments from that portion of the brief to this issue. However, as discussed *infra*, the "reasonable suspicion" standard that applies to the "protective search" inquiry is lower than the "probable cause" standard that applies to the "exigent circumstances" inquiry.

entry were present." The U.S. Supreme Court held that that was "the proper legal standard." *Id.* The question, then, is whether the officers had probable cause to believe that a danger to officers was present.

Officer O'Donovan declares that the officers swept the backyard because "we knew Defendant to be a member of the Mongols Motorcycle Gang and did not know if Defendants was present at the home alone." O'Donovan Decl. ¶ 9. "We also wished to secure any firearms that may be on the scene to ensure our own safety." *Id.*

The fact that officers "did not know if Defendants was present at the home alone" is of little probative value by itself. This is true in practically any case in which officers conduct a sweep of a home. The United States points to no facts tending to show Lundin was accompanied: no other cars were parked in the driveway, no other voices were heard from within. The only facts the government offers as tending to show that a dangerous individual might have been in the yard or the home are these: (1) that Lundin allegedly belonged to the Mongol motorcycle gang, (2) that Miller reported that Lundin had told Miller that he was "going to get his Mongol brothers to get me," (3) that Lundin told Hinds that Lundin had been robbed of marijuana in his home while his two daughters were at the house, and (4) that Miller believed Lundin was operating a "grow" out of the house. Exh. A to Hansen Decl., at C0105–06, C0116, C0122, C0133, C0150 (ECF Nos. 29-3 & 29-4).

These facts suggest the possibility, although not the likelihood, that others could

have been within the home. But the government cites no cases indicating that facts such as these support a finding of probable cause to believe that dangerous persons within a home posed a danger to officers. In *Mincey*, 437 U.S. at 393–95, 98 S.Ct. 2408, and in *Olson*, 495 U.S. at 100, 110 S.Ct. 1684, the Supreme Court rejected the use of the exigent circumstances exception. In another of the government's cited cases, the Supreme Court emphasized that the "seizures occurred prior to or immediately contemporaneous with . . . [a suspect's] arrest, as part of an effort to find a suspected felon, armed, within the house into which he had run only minutes before the police arrived." *Warden, Md. Penitentiary v. Hayden*, 387 U.S. 294, 299, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967). The officers in that case acted on information that the dangerous person had just entered the house. *Id.*

The final citation on which the government relies is dicta in a consent search case. *See Georgia v. Randolph*, 547 U.S. 103, 118, 126 S.Ct. 1515, 164 L.Ed.2d 208 (2006) ("it would be silly to suggest that the police would commit a tort by entering, say, to . . . determine whether violence (or threat of violence) has just occurred or is about to (or soon will) occur"). The *Randolph* court was also explicitly discussing whether entry in that situation was a *tort*, not whether it was an unreasonable search that violated the Fourth Amendment. *See id.* ("[t]he dissent's argument rests on the failure to distinguish two different issues: when the police may enter without committing a trespass, and when the police may enter to search for evidence").[6]

---

**6.** There were constitutional means at the officers' disposal, had they chosen to avail themselves of them. Rather than seizing the guns during the sweep, they could have secured the premises, ensured that no one was inside, and then posted an officer to ensure that no one

else entered the home while a search warrant was prepared. If they had chosen that route, the officers could have seized the guns during that later, warranted, search (as long as the warrant was based on probable cause that the officers already possessed before seeing the

### b. Destruction of Evidence

The government also argues that "[t]he crash at the rear of the residence provided police with a reasonable suspicion that Defendant was in the process of attempting to discard or destroy evidence." Opp. 13:16–18. Again, however, since Lundin was in custody at the time of the April 23 search, any fear of destruction of evidence was contingent upon the likelihood that another person was inside to perform the destruction. In all of the cases cited by the government in which a court upheld a warrantless search under the destruction-of-evidence doctrine, officers had significant reason to believe (and were correct in believing) that there were individuals within the area searched who were in a position to destroy evidence. *See King*, 131 S.Ct. at 1856 (police smelled marijuana, had observed a suspect entering a room, and heard people inside moving after officers knocked on the door); *United States v. McLaughlin*, 525 F.2d 517, 519 (9th Cir.1975) ("[w]hile knocking, the agents heard shuffling from within and proceeded to enter the house"); *United States v. Bustamante-Gamez*, 488 F.2d 4, 6–7 (9th Cir.1973) ("one of the agents walked up a short driveway to the garage door at the 11262 address and heard sounds which he described as 'cloth dragging on the cement floor, a grunt, groan, and a tool hitting the floor,' " and then after knocking the officers feared those inside would destroy evidence).

The officers might have been justified in entering the house or the yard without a warrant to stop *Lundin* from destroying evidence. But once Lundin was in custody, the fear that Lundin would destroy evidence was obviously dissipated. And without probable cause to believe that oth-

ers were inside, the officers were not justified in conducting a warrantless search.

### 3. Inevitable Discovery

Finally, the United States argues that the "inevitable discovery" doctrine permits admission of evidence even if the searches were unconstitutional. The government's papers are unclear about which evidence it seeks to introduce under this doctrine. The government's opposition brief states that "[e]ven if Defendant is correct and all of the initial searches in the early morning of April 23 were illegal as violations of the Fourth Amendment, *the evidence from the subsequent search on April 24* ... should be admitted under either the independent source or the inevitable discovery doctrine." Opp. 14–15 (emphasis added). But later, the brief says that "even if *the initial searches were illegal*, Murray [v. United States, 487 U.S. 533, 539, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988) ] dictates that the evidence seized during *those searches* be admitted as inevitable discovery of the subsequent, warranted search." *Id.* at 16 (emphases added).

It is possible to read the first sentence as conceding that the two guns seized on April 23 cannot be admitted pursuant to the inevitable discovery doctrine, and that those guns are inadmissible if neither the "protective sweep" nor the "exigent circumstances" exceptions apply. However, the court will not assume that the government has abandoned an argument absent a clear statement to that effect. Therefore, this analysis assumes that the government seeks to introduce even the items seized on April 23 pursuant to the inevitable discovery doctrine. The court addresses the government's argument regarding the

guns during the sweep). *See Murray v. U.S.,* 487 U.S. 533, 535–36, 108 S.Ct. 2529, 101

L.Ed.2d 472 (1988).

items seized in the April 24 search at Part IIIB–4, *infra*.

Defendant argues that the government has failed to meet its evidentiary burden in establishing that this exception to the warrant requirement applies. Defendant's Reply Brief at 15. This court agrees.

 The inevitable discovery rule prevents the suppression of illegally obtained evidence "[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means." *Nix v. Williams*, 467 U.S. 431, 444, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984); *see also United States v. Boatwright*, 822 F.2d 862, 864–65 (9th Cir. 1987); *United States v. Young*, 573 F.3d 711, 721 (9th Cir.2009). The purpose of this rule is to put the police in the "same, not a worse, position that they would have been in if no police error or misconduct had occurred." *Nix*, 467 U.S. at 443, 104 S.Ct. 2501. The government must meet its burden of proof by relying on "demonstrated historical facts capable of ready verification or impeachment" rather than "speculative elements." *Nix*, 467 U.S. at 443 n. 5, 104 S.Ct. 2501. The Ninth Circuit has "never applied the inevitable discovery exception so as to excuse the failure to obtain a search warrant where the police had probable cause but simply did not attempt to obtain a warrant," *United States v. Mejia*, 69 F.3d 309, 320 (9th Cir.1995), because that would "completely obviate the warrant requirement." *Id.* (quoting *United States v. Echegoyen*, 799 F.2d 1271, 1280, n. 7 (9th Cir.1986)).

In *Nix*, the Supreme Court first explicitly endorsed the inevitable discovery rule. 467 U.S. at 444, 104 S.Ct. 2501. There, police led two hundred volunteers in a systematic search for the body of a missing ten-year-old girl in an area where the body was believed to have been left by the defendant. *Id.* at 448, 104 S.Ct. 2501. Police halted the search after illegally learning the exact whereabouts of the girl's body from the defendant, in violation of his *Miranda* rights. *Id.* at 449, 104 S.Ct. 2501.[7] The record established that the search party was closing in on the location of the body, which would have likely been found within three to five hours of additional searching. *Id.* The defendant argued that evidence concerning the location and condition of the body should be suppressed as "fruit of the poisonous tree" and that "the record only contain[ed] the 'post hoc rationalization' that the search efforts would have proceeded" to the location where the body was found. *Id.* at 441, 448, 104 S.Ct. 2501. Because the Supreme Court found the record established that the "body inevitably would have been found" shortly after it was found, the Court prevented suppression of the evidence concerning the location and condition of the body. *Id.* at 450, 104 S.Ct. 2501.

On the other hand, in *Young*, the Ninth Circuit found the inevitable discovery rule not satisfied in a felon-in-possession-of-a-firearm case. 573 F.3d at 713. There, after hotel staff found a firearm in the defendant's room, the staff left the firearm in the room, locked the defendant out of his room, and called the police. *Id.* at 714. Calling the police contravened the hotel's written policy that required the hotel to inform its guests of the hotel's policy against possession of weapons and offer to store the firearm for the duration of the guest's stay. *Id.* A police officer arrived at the hotel, learned that the defendant had been to prison and that hotel staff had

---

**7.** It is now well-established that the "inevitable discovery" rule applies to other constitutional violations, such as unreasonable searches. *See Young*, 573 F.3d at 713.

found a gun in the defendant's room, and then arrested the defendant. *Id.* at 715. Next, after being told by his supervising officer not to enter the defendant's hotel room and search it, the arresting officer had the hotel staff search the defendant's room while he watched from the hallway. *Id.* Upon seeing the gun, the officer entered the room and seized it. *Id.*

The Ninth Circuit, which described the search as a "warrantless search of a private residence, not incident to an arrest," *id.* at 722, reached two main conclusions in applying the inevitable discovery rule. First, the government did not show by a preponderance of evidence that the defendant would not have returned to his room, but for the hotel's contravention of its written policy and the arresting police officer's illegal search. *Id.* "Assuming that staff had followed the written policy … it is entirely likely that after some discussion with hotel security, [the defendant] might have decided to store the firearm, or, alternatively, take his belongings with him and vacate the room." *Id.* Second, "instead of getting a warrant, [the police officer] conducted a warrantless search" such that "[t]he only reason the police possession of the firearm was inevitable was because the officer did what officers sometimes do—he took a short cut." *Id.* On the basis of these findings, the court held that the inevitable discovery rule did not apply to the evidence seized during the search of the defendant's hotel room. *Id.*

▪ Here, in arguing that the guns seized during the warrantless search would have inevitably been discovered, the government focuses on the admissibility of the evidence seized in the subsequent, warranted, searches that occurred on April 24. The United States argues "Aponte and Fulton had sufficient evidence to apply for a warrant" and that "[i]t is irrational to believe that … Aponte would not have

sought a warrant to search [Defendant's] home." Opp. 15–16. So far, so good. However, establishing that the police would have promptly searched Defendant's home is only part of the analysis.

The *Nix* court relied not only on the fact that there was an independent *means* of finding the body via the search party, but also on evidence that the search party ultimately *would* have found the body. 467 U.S. at 449, 104 S.Ct. 2501. As applied to this case, *Nix* requires the government to show that the guns seized in the backyard "would have remained in the same place and in the same condition" or at least in a similar enough location that they would inevitably be discovered by subsequent legal searches. The government has failed to show that, at a minimum, the guns would have been present in the home or backyard the next day, such that they would have inevitably discovered by the police in any subsequent warranted search of Defendant's home.

Importantly, unlike *Nix*, in this case the evidence seized was not sitting in one place and unlikely to be moved during the time period the investigators were likely to find it. It was within Lundin's domain and control and easily movable. In *Young*, the Ninth Circuit held that, but for the improper actions of the hotel and police, the defendant could have removed the guns from his hotel room, and that the government had failed to establish otherwise. 573 F.3d at 722. That possibility was considered sufficient to take the situation outside the scope of the inevitable discovery doctrine. Here, the government has not shown that, had the April 23 seizure and search not occurred, the Defendant could not have, or would not have, disposed of or moved the guns prior to the April 24 search. Even had the arrest been legal, the government has not demonstrated that there is no chance other people could have

entered the home and moved the guns prior to any later legal search. Thus, it is entirely possible that by not suppressing the evidence of the initial, warrantless search of the backyard, the police would be put in a better position because of their misconduct.

Moreover, even if the government could meet its burden of proof regarding the inevitable discovery rule, admission of the gun evidence from Defendant's yard is not appropriate because applying the inevitable discovery rule would "excuse the failure to obtain a search warrant where the police had probable cause but simply did not attempt to obtain a warrant." *Mejia*, 69 F.3d at 320.

The government argues *Mejia* does not apply because "Deputy Aponte had already requested the Defendant be arrested ... and asked Deputy Fulton to prepare a warrant application shortly after the alleged illegal searches." Opp. 15. Defendant argues that the police "had time to [secure a warrant] before the first search and did not." Reply 16. Defendant appears to be correct. Deputy Aponte concluded his interview with Hinds at about 2 a.m., issued a BOLO for Lundin at that time, and then began preparing an incident report at about 2:20 a.m. Exh. B to Hansen Decl., at C0003, 158–59. But neither he nor any of his fellow officers sought either a search warrant or an arrest warrant at any point before officers went to Lundin's house at 4 a.m.

Because there are no legitimate reasons for the police to have searched Defendant's yard subsequent to his arrest, *see* discussion *supra*, the police could have, and thus should have, obtained a warrant prior to entering the backyard. In *Young*, the police chose to illegally search the defendant's hotel room rather than wait for a warrant. 573 F.3d at 722. Here, the police similarly jumped the gun by searching

Lundin's house without attempting to secure a search warrant.

Applying the "inevitable discovery" exception requires particular care. At one end of the spectrum, the doctrine must allow for cases such as *Nix*, in which a nonconsequential constitutional violation should not penalize law enforcement any further than the exclusionary rule itself demands. But at the other extreme, if applied too loosely, the "inevitable discovery" exception could begin to swallow the exclusionary rule. "[T]he argument that '[i]f we hadn't done it wrong, we would have done it right,' is far from compelling." *State v. Topanotes*, 76 P.3d 1159, 1164 (Utah 2003) *(quoting U.S. v. Thomas*, 955 F.2d 207, 210 (4th Cir.1992)). Here, applying *Mejia*, the court concludes that the exception does not apply when the officers could have obtained a search warrant but did not.

### 4. Effect of Suppressing the Fruits of the April 23 Search

For the foregoing reasons, the court concludes that the government has failed to justify the officers' April 23 warrantless search. The guns seized in that search must be suppressed as the fruits of an unconstitutional search.

The court does not, however, agree with Defendant that the fact that the April 23 seizure and search were unconstitutional requires all evidence obtained in the April 24 search to be suppressed. Because the evidence from the April 24 search was obtained pursuant to a warrant partially based on evidence seized during an illegal search, the most applicable case is *Murray v. U.S.*, 487 U.S. 533, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988). There, officers learned about the contents of a warehouse through a search assumed to be unlawful, but officers seized no evidence during that search. *Id.* at 535, 108 S.Ct. 2529. The

agents then applied for a warrant, and "[i]n applying for the warrant, the agents did not mention the prior entry, and did not rely on any observations made during that entry." *Id.* at 535–36, 108 S.Ct. 2529. The Supreme Court held that evidence was admissible provided the "warrant-authorized search of the warehouse was an independent source of the challenged evidence." *Id.* at 544, 108 S.Ct. 2529.

As Defendant points out, "[t]he Ninth Circuit, in applying *Murray,* has held that a two step process need be undertaken when a warrant is obtained after an illegal search has been undertaken: first, the court must purge the search warrant affidavit of any information gleaned as a result of the illegal search; and second, the agents must prove to the court's satisfaction that they would have applied for a warrant even without the information they gleaned from the illegal search." Reply at 14 (*citing United States v. Duran–Orozco,* 192 F.3d 1277, 1281 (9th Cir.1999)). Unlike in *Nix* and *Young,* the *Murray* and *Duran–Orozco* courts did not impose upon the government the additional burden of proving that the actually seized evidence would have stayed in the same location between the time it was unlawfully discovered and the time it was lawfully seized.

In their statement of probable cause, the officers focused primarily on the officers' interviews with Hinds, in which she relayed the fact that Lundin had recently assaulted and kidnapped her, forced her to take drugs, and brandished two firearms. Exh. B to Anderson Decl., at C0075–76 (ECF No. 30–4). In suppressing the evidence obtained on April 23, the court must reimagine the probable cause statement after "purging" it of several facts: that Lundin was located at his residence at 4 a.m. on April 23, that two firearms were located in his home at that time, and that Lundin was not in possession of his cell phone when he was arrested. *Id.* The fact that Lundin's car was located at his address need not be purged, since officers could have observed that fact without conducting the unreasonable seizure and search.

After "purging" the statement of probable cause of those specific facts, the court concludes that the statement establishes probable cause to believe that Lundin had recently committed assault and kidnapping using firearms and drugs, and that he was likely to be a member of the Mongol motorcycle gang. The statement also established probable cause to believe that guns used in the assault, Lundin's cell phone, drugs, and Mongol-related indicia and paraphernalia would be inside the home. All of these fall within the types of items seized on April 24. Exh. A to Anderson Decl., at C0005–6 (ECF No. 30–1).

The court also concludes that, given the seriousness of the alleged crime, the officers would have conducted a search warrant for the home even had they yet to discover there were two guns inside and had yet to detain Lundin.

The court next turns to the validity of the remainder of the April 24 search warrant.

## C. Sufficiency of the April 24 Warrant

Defendant also argues that, independent of the issues with the April 23 search, there are two problems with the warranted April 24 search. First, he argues that the warrant application contained false and material misrepresentations, which, pursuant to *Franks v. Delaware,* 438 U.S. 154, 155–56, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), require the court to hold an evidentiary hearing. Second, he argues that the warrant was overly broad and lacked a sufficient statement of probable cause.

### 1. False or Misleading Statements

■ Defendant points to the following three statements or omissions in the affidavit officers submitted in support of a warrant to search Defendant's home on April 24: (1) Hinds' and Miller's statements regarding Lundin's membership in the "Mongol" motorcycle gang; (2) the failure to relay one officer's apparent belief that Lundin was a *retired*, rather than current, "Mongol," and (3) the failure to disclose the resemblance of the guns seized on April 23 to those described in Hinds' statement. All three arguments fail.

■ To justify a *Franks* hearing, defendant must make a "substantial preliminary showing" that (1) a false statement was either intentionally or "with reckless disregard for the truth" included in a warrant affidavit, and (2) the false statement materially affected a finding of probable cause. *Id.* at 155–56, 98 S.Ct. 2674. Merely showing that statements are not true does not meet the defendant's burden so long as "the information put forth [in the affidavit was] believed or appropriately accepted by the affiant as true." *Id.* at 164–65, 98 S.Ct. 2674. If, during a *Franks* hearing, the defendant can meet the same criteria by a preponderance of the evidence, the court must determine if the warrant would have been granted, but for the false statements. *See id.* at 156, 98 S.Ct. 2674. If the court finds no probable cause, all evidence seized pursuant to the warrant must be suppressed. *Id.*

*Franks* also applies to "deliberate or reckless omissions of facts that tend to mislead." *United States v. Stanert,* 762 F.2d 775, 781 (9th Cir.1985). "All that is required is that the defendant make a substantial showing that the affiant intentionally or recklessly omitted facts required to prevent technically true statements in the affidavit from being misleading." *Id.*

In the statement of probable cause, Detective Fulton provided a copy of Deputy Aponte's report regarding his conversation with Hinds. Exh. B to Anderson Decl., at C0075 (ECF No. 30–4). That report states: "Lundin repeatedly made comments that . . . he was a member of the Mongols motorcycle gang." *Id.* This statement is more imprecise than untrue. Hinds only said that Lundin had said he was a "Mongol," and she may not have understood what that term meant, since she asked the officer "Is the Mongols bad?" But Deputy Aponte readily understood Lundin's reference.

When Ms. Hinds relayed that Lundin used the term "Mongols," the deputy was entitled to conclude that Lundin meant the Mongols motorcycle gang. The Hell's Angels analogy the defendant uses in his papers is actually quite instructive. The defendant says that if a witness said that a suspect was an angel, that would not be grounds for assuming that the suspect was a member of the Hell's Angels motorcycle gang. That might be true. "Angel" has several different meanings. But if the witness said the suspect was a *Hell's* Angel, then any reasonable officer would be justified in thinking that the suspect was a member of the Hell's Angels motorcycle gang. Similarly, when someone is described as a "Mongol," then a reasonable officer is justified in thinking that person is a member of the Mongols Motorcycle gang. Indeed, if the term "Mongol" was supposed to have another meaning to Deputy Aponte, defendant does not say what that is.

Defendant has not shown that this statement was an intentionally or recklessly false statement that materially affected the statement of probable cause. The statement was "appropriately accepted by the affiant as true." *Franks,* 438 U.S. at 164–

65, 98 S.Ct. 2674. If stated more precisely—"Lundin repeatedly made comments that … he was a 'Mongol,' which the interviewing officer recognized as a likely reference to the Mongols motorcycle gang,"—the search warrant would almost certainly still have issued, and so any "misrepresentation" was not material. It is doubtful, for example, that the magistrate would have needed to consider the possibility that Mr. Lundin was merely identifying the fact that he or his family were from Mongolia.

Defendant's second argument is that the application omitted the fact that at least one officer apparently believed the Defendant to be a *retired* member of the Mongol's motorcycle gang. This, too, is unavailing because Defendant has failed to make a preliminary showing that this omission was deliberate or reckless. Fatal to Defendant's argument is that Lundin's own alleged words contradict the contention that he was no longer an active member of the gang. Lundin allegedly told Hinds "that's what us Mongols do" and "we leave no witnesses." Exh. A to Hansen Decl., at C0105–06. Lundin allegedly threatened Miller with retribution from his "Mongol brothers." *Id.* at C0150. Because of the substantial weight of evidence contradicting the contention that Lundin was "retired," including a statement by a single officer that Lundin was "retired" would not materially affect a finding of probable cause.

Finally, Defendant argues that the affidavit omitted the fact that the two seized guns resembled those described by Hinds in her statement to Deputy Aponte. First, Defendant's conclusory argument that "the omitted fact that Dep. Aponte recognized the recovered guns as matching the description provided by Ms. Hinds was the kind of thing the judge would wish to know" falls short of being a substantial

showing that the fact was recklessly omitted. Motion at 24 (internal quotation marks omitted). Second, while a magistrate may be less willing to issue a warrant to search for guns allegedly used in a crime if those guns may have already been found, in this case, the magistrate was already aware of this possibility because the facts that two guns had been recovered during the April 23 search was included in the affidavit. The additional fact that the guns matched a general description given by Hinds would likely not have a material effect on whether or not there was probable cause at the time the warrant was requested.

### 2. Breadth of the Warrant

■ Defendant also argues that the warrant was overbroad. He argues that there was no probable cause to search the home for additional guns, since the officers had already seized two guns that resembled the guns Hinds recalled seeing Lundin brandish during their encounter. But the description of the guns was fairly generic and uncertain, and so there was still a "fair probability" that the guns used in the assault would be found within the home. *United States v. Luong,* 470 F.3d 898, 902 (9th Cir.2006) *(quoting Gates,* 462 U.S. at 288, 103 S.Ct. 2317). And since Defendant was a felon, it was illegal for him to own *any* firearms, and the fact that Hinds had seen him brandish firearms created a "fair probability" that he might own others and keep them in his home.

Defendant argues that the warrant was overbroad in allowing a search for any and all cell phones. The officers had no more specific description of the phone Lundin used during the alleged abduction that would have allowed them to "describe the items more particularly in light of the information available to … [them] at the time the warrant was issued." *United*

States v. Vasquez, 654 F.3d 880, 884 (9th Cir.2011).

Third, Defendant argues that "there was no cause to search Mr. Lundin's home for indicia of gang membership or gang activities." Motion 25:17–18. To justify a search warrant, there must be a "nexus" between "the item to be seized and criminal behavior." *Warden v. Hayden*, 387 U.S. at 307, 87 S.Ct. 1642. The court agrees with the United States that the "nexus between the criminal activity and the items to be seized is clear—Defendant made repeated threats, backed up by his affiliation with the Mongols motorcycle gang." Opp. 24:3–5. Indicia of his membership in the gang would be relevant to assessing the validity of those threats.

 Finally, even assuming *arguendo* that warrant might have been overbroad, there are no "clear indicia of bad faith" which would require suppression of the evidence. *United States v. Crews*, 502 F.3d 1130, 1138 (9th Cir.2007).

The court will not suppress evidence seized in the April 24 search.

### C. Miranda Violation

Defendant argues, and the United States does not dispute, that officers questioned Lundin twice in violation of his *Miranda* rights: first, when an officer asked him "[y]ou want to go by Whitey or your, uh—your regular name?" shortly after he was arrested, and second, when officers telephoned Lundin at the jail to ask him the combination to the gun safes in his home. The United States agrees that it may not use the statements Lundin made in response to those questions in its case-in-chief. Opp. 24–25. The United States points out, and Defendant does not dispute, that while the statements themselves must be suppressed, any physical "fruits" of the statements are not suppressed. *See*

United States v. Patane, 542 U.S. 630, 636, 124 S.Ct. 2620, 159 L.Ed.2d 667 (2004).

The motion to suppress Lundin's statements is granted insofar as it seeks to suppress the statements themselves from use in the government's case-in-chief.

### IV. CONCLUSION

Defendant's motion to suppress is GRANTED IN PART insofar as it seeks to suppress the evidence seized in the April 23 search, and insofar as it seeks to suppress from the government's case-in-chief the statements Lundin made in response to the questions discussed at Part III–C, *supra*. The motion is otherwise DENIED, as is Defendant's request for a *Franks* hearing.

**IT IS SO ORDERED.**